UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------x
UNITED STATES OF AMERICA            :

      -against-                              :            S7 13-CR-521-05 (LTS)

SLAWOMIR SOBORSKI,                   :

             Defendant.       :
-----------------------------------------------------x


# MEMORANDUM IN AID OF SENTENCING
# ON BEHALF OF DEFENDANT SLAWOMIR SOBORSKI


William J. Stampur, ESQ.
Stampur and Roth
Attorney for the Defendant
SLAWOMIR SOBORSKI
299 Broadway, Suite 800
New York, NY 10007
212-619-4240

## Introduction

Defendant Slawomir Soborski, a Polish national and veteran of Poland's armed forces who was extradited here, respectfully submits this memorandum in aid of sentencing, currently scheduled for October 22, 2015. On February 6, 2015, Mr. Soborski pleaded guilty, without an agreement with the government, to one count of conspiring to import a controlled substance into the United States, in violation of 21 U.S.C. §§ 959, 960 & 963. Because the offense involved more than five kilograms of cocaine, it carries a ten-year mandatory minimum. However, because Mr. Soborski indisputably satisfies the conditions for "safety-valve" relief under 18 U.S.C. § 3553(f), the Court should sentence him without regard to any mandatory minimum.

Mr. Soborski pleaded guilty after receiving the government's *Pimentel* letter and not pursuant to its plea agreement because the Guidelines enhancements are highly contestable and mostly unwarranted. Even so, and despite getting out from under the mandatory minimum, his guideline calculation, because of the amount of cocaine involved (between 150 and 450 kilograms), is unreasonably high. Mr. Soborski's role was attenuated and peripheral in a plan contrived and manufactured. He had no more control over the amount of cocaine chosen by the government than in any other detail of the conspiracy beyond his influence. None of that absolves Mr. Soborski of criminal liability, but it establishes that adherence to the advisory range would produce a sentence far longer than what is necessary to achieve the purposes set forth in Section 3553(a).

It takes little independent scrutiny to see that this case is not all that it appears to be, at least with respect to this defendant. The government announced the arrests with great fanfare and sensationalism, with a plot out of a blockbuster movie (that the government itself produced and staged). And yet Mr. Soborski will appear before the Court and ask for leniency in a banal

ritual repeated dozens of times in courtrooms across the country on the date of his sentencing, a low-level conspirator involved in a larger conspiracy, somewhat different in kind but not in form. And like similarly-situated defendants, unless the guidelines are applied with great care, their focus on quantity at the expense of role risks overshadowing Mr. Soborksi's actual offense conduct, and his heretofore exemplary history and background.  A reasonable sentence would include a relatively brief period of incarceration, and is warranted by the nature of the highly unusual conspiracy coupled with Mr. Soborksi's limited participation in it, his exemplary background in law enforcement until the instant offense, the conditions and experiences he was forced to suffer since his arrest, and the marginal deterrent value an unduly long sentence would yield.

A.     The Offense Conduct and Mr. Soborski's Background

Mr. Soborski comes from a modest, working-class background in Poland.  He grew up during the period in which Poland belonged to the Eastern Bloc and was under Soviet domination, in a one-bedroom apartment that housed himself, his parents and his sister.  His father is and remains a truck driver.  His mother worked as a waitress.  Mr. Soborski has an eighteen year-old son from a previous relationship, whom he would see on a daily basis in Poland.  He lives with his mother in Poland, and they remained in close contact until Mr. Soborski's arrest.

An ex-girlfriend, whom Mr. Soborski met while doing security work at the airport after September 11th, writes of his kindnesses and caring, and that after a serious injury, she "could depend on him with everything."  Letter of Wiwiana Grzybowska, dated August 12, 2015. (See Exhibit A). She further writes that he "supported me profoundly, made me never to give up, encouraged to begin post-gradual studies." [sic]  *Id.*  She also writes touchingly of Mr.

3

Soborksi's relationship with his son and their "really close bond." This description of Mr. Soborski is in keeping with the "professionalism and hard work" that he consistently displayed in his legitimate employment, as set forth in the attached letters of reference, which describe him as a "courteous and professional individual" who "left an excellent impression on the vessel crew." (See Exhibit B).

Mr. Soborski has an admirable record of service to country and to the forces of order and stability world-wide. He has served bravely in some of the most dangerous places on the planet, including in Afghanistan, Iraq, Haiti and elsewhere. Mr. Soborski spent nearly fifteen years in the Polish national military or government/law enforcement service until leaving in 2011, including extensive service in a counter-terrorism unit. He provided protection to the President of Poland for approximately five years. Among others, he has also provided protection for President Bush and Pope John Paul II while in Poland. In his anti-terror capacity while working for the Polish government, Mr. Soborski conducted many operations involving hostage taking, hijacking, and other high profile raids to arrest and interdict organized crime figures, drug traffickers and other high-value targets.

After leaving the service, he worked as a security contractor for multiple organizations with a top secret security clearance issued by the Bureau of Counter-Terrorist Operations of the Polish National Police, including work in Eastern Europe, Haiti and Afghanistan, Dubai and elsewhere, and has significant experience in maritime security, providing protection against pirates and other seaborne threats against vessels in the Indian Ocean and elsewhere. Mr. Soborski's interests and his career have been wholly aligned with those of the United States and its interests. (See Exhibit C-Resume of Slawomir Soborski).

4

Unfortunately, these activities did not provide financial stability, and when confronted with an opportunity to make extra money in illegal fashion, Mr. Soborski lacked the strength to resist. For that choice, he was arrested, brought here, and prosecuted. And yet he did not seek out trouble or an illegal lifestyle; it sought him. Worse, the "it" in question is the United States government. But it is not as if Mr. Soborski shirked legitimate employment or the responsibility and diligence of honest work -- his misstep is a true aberration in an otherwise honorable career devoted to doing good and preventing harm.

Mr. Soborski accepted the invitation of Joseph Hunter to join his team of former military personnel, with whom he had no prior connections, as they would provide security or purported "counter-surveillance" to what Mr. Soborksi ultimately came to believe (only after having already traveled to Thailand) was a drug-trafficking organization that imported large quantities of cocaine into the United States. As such, between March and June 2013, Mr. Soborski traveled to Asia, Africa and the Caribbean to provide security for meetings in which he did not otherwise participate or even speak, and to conduct surveillance of a boat and an airplane as it was purportedly loaded with kilograms of cocaine for importation into the United States. Mr. Soborski did not offload or transport any contraband himself on or off of the airplane. He did not possess a weapon in the course of providing protection or security, and his conduct is of a very different type than that traditionally performed by international or domestic drug offenders. He kept mostly to himself, and did not socialize extraneously with his co-conspirators, nor was his motive anything other than the lure of serious financial gains for relatively simple work. Quite literally, he stood apart from his co-defendants.

Such actions make him a criminal conspirator in the eyes of the law and by his own admission, but they do not qualify him for an unreasonably long prison sentence of the type the

government seeks.  The objectives and methods of a heartland international drug-trafficking organization were not his own, and stand in contrast to his entire career.  To the extent that his conduct is made more serious because of its transnational character, it is a function or a byproduct of his previously legitimate experience in international security.  But the harm and the violence that frequently results from such undertakings were not something he wished to bring about or condoned; they are, mystifyingly, what he has fought against.  As such, the seriousness of the offense, and of international drug-trafficking in general, needs to be balanced against his distance from traditional drug-trafficking in terms of the limited scope of his conduct, and his admirable record in preventing the sorts of harms that are associated with international drug distribution.  Insofar as proportionality is an important component of sentencing (and of deterrence, addressed below), and just as the seriousness of Mr. Soborksi's conduct should not be minimized, nor should it be overstated.  Nor should Mr. Soborksi be responsible or accountable for all of the ills that drug trafficking and the more culpable drug traffickers engender.

Relevant conduct aside, the sins of Mr. Soborksi's co-defendants should not be visited upon him.  In particular, Mr. Soborski had nothing to do with the so-called "bonus-work" and the assassination plot that ensnared his co-defendants here. Whatever errors in judgment Mr. Soborski showed in entering into the conspiracy, he had sense enough to make clear that he wanted nothing to do with Hunter's other involvement in  conspiring to assassinate a DEA informant, a purported leak in the Colombian organization, and a DEA Agent.  It was well beyond the scope of what Mr. Soborski agreed to undertake.  Mr. Soborski is not charged with those offenses, and they should not be given any consideration in determining his sentence.

Nevertheless, the Probation Report is saturated with salacious details of the murder-for-hire plot, in which Mr. Soborski played no part. ¶¶ 26, 29-31, 42-45, 51-64. Aside from the relevance of including such information as prejudicial to the Court's consideration of Mr. Soborksi's sentence, its inclusion in the PSR poses a significant risk that the Bureau of Prisons will give it undue weight in evaluating Mr. Soborksi's security designation and his Public Safety Factors. It could mean the difference between a low-security facility and a medium security or a penitentiary and would skew the result, portraying him as far more dangerous than in reality. To the extent possible, we urge the Court not only to not consider the murder for hire plot and to strike it from the PSR, but, in the alternative, to direct the Bureau of Prisons to not factor such conduct into Mr. Soborksi's security designation and to request that he be designated to a low-security facility.

Amidst the backdrop of international drug-trafficking and murdering a DEA informant, and all the images and suggestiveness that such activities conjure up, it is easy to lose sight of what Mr. Soborksi actually did and who he is. The Court's task is made more difficult and the possible sentence more skewed because Mr. Soborksi is exposed to the sorts of weight-based draconian penalties intended for kingpins, as discussed more below. But as Your Honor searches for a sentence that is fair, just, and no longer than necessary, we ask that you keep in mind the individual circumstances Mr. Soborski and his conduct bring to bear.

B.    Mr. Soborski's Conditions of Confinement Further Merit
      a Non-Guidelines' Sentence

Mr. Soborski endured an extraordinarily difficult period of custodial confinement in Estonia, where he was arrested and awaited extradition to the United States for a period of approximately seven months. During the arrest (based upon issuance of an SDNY warrant),

7

which he did not resist, the Estonian police jumped on his back, crushing him to the floor, which caused significant bleeding and two losses of consciousness. It was only nine hours later that he received any treatment, when the Estonian authorities recognized that he required immediate medical attention. He was taken to the hospital, and could not move his legs. Mr. Soborski was informed by the emergency room physician that his stomach was full of blood. The result of the arrest was emergency surgery, which required removing Mr. Soborski's spleen. He is still dealing with repercussions from the incident, including residual pain in his stomach and neck, infections, and delayed healing. This treatment in Estonia does not appear to be in dispute, and the government does not contest it.

As if the beating were not enough, the conditions Mr. Soborski endured while in Estonian custody were truly abysmal, straight from the Soviet gulag playbook. Mr. Soborksi spent approximately 3½ months in Talinn prison, a relic of the Soviet era and Estonia's status as an Soviet Satellite Republic, where he remained in perpetual solitary confinement and in especially horrendous conditions. He lost approximately 45 pounds, and was fortunate if he showered once a week. He was not permitted to do laundry or change his clothes. He was permitted neither phone calls nor personal visits. The bed consisted of little but a thin mattress atop concrete. Most of the time, Mr. Soborski was in substantial pain as a result of the arrest and ensuing operation, compounded by the poor conditions. The toilet was essentially a hole in the ground on a raised platform. The cell had one window, but was placed high on the wall and was left open in all conditions. The cells need to be seen to be believed, and attached are photographs not of Mr. Soborski's precise cell, but of those essentially similar to his own. They go a short way in depicting the decrepitude, decay, isolation and cramped squalor that confronted Mr. Soborski on a daily basis. (See, Exhibit D).

8

After more than three months in Talinn prison, through the intercession of a helpful prison guard, Mr. Soborski was transferred to Viru - a mild improvement. In total, Mr. Soborski spent approximately seven months in Estonian prison before the extradition here, in conditions that have been condemned by international human rights organizations. *See* Report to the Estonian Government on the Visit to Estonia by the European Committee for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment ["CPT Report," Council of Europe, at Strasbourg, January 2014], at ¶ 6, page 13, ¶ 50, page 31 (describing "substandard" "very poor" and "extremely dilapidated" conditions at Talinn prison, where "most of the cells were dilapidated, poorly ventilated and in a poor state of hygiene" and "excessive" use of solitary confinement at Viru); *Case of Tunis v. Estonia*, European Court of Human Rights, Dec. 13, 2014, at 8-9 (finding that confinement conditions in Talinn prison, including overcrowding in small cells and limited outdoor exercise, violated Estonia's international agreements against infliction of inhuman or degrading treatment or punishment). The CPT Report, at 27, describes Tallinn Prison as "one of the last vestiges of a previous era remaining to be removed from the prison estate." And while the U.S. government is not responsible for Mr. Soborski's ordeal in Estonia, it was only this case and the underlying warrant that precipitated his arrest there.

To make matters worse, Mr. Soborski has spent about 17 months at the Metropolitan Detention Center in Brooklyn, which presents an additional difficulty normally not encountered. He is incarcerated in a foreign country where he knows no one, and where his family and friends have not been able to visit. Thus, apart from the legal visits by counsel, Mr. Soborski has been effectively alone for nearly eighteen months here, coming on the heels of the abuse he suffered in Estonia. This isolation has aggravated the conditions of incarceration at the MDC, already a difficult place of imprisonment even in the best of circumstances, rife with overcrowding,

unsanitary conditions, inadequate programs and lack of opportunities for outdoor recreation, as

numerous courts have recognized. Moreover, even if Mr. Soborski is designated to another

facility to serve the remainder of whatever sentence the Court deems just, his loved ones will still

be unlikely to be in a position to visit. Only counsel could come to see him, and only if he were

designated to a facility in the northeast area. Worse still, because he is an alien, Mr. Soborski

would likely be ineligible for placement in a low-security prison or a camp, and in placement in

BOP programs (including early release) that make incarceration shorter, less onerous and more

productive.

    Thus, from the very beginning of being taken into custody, and until the last moment
prior to his release (which will likely be into ICE custody pursuant to an immigration hold, a
further ordeal with no guarantee of immediate departure from the country and in similarly
inadequate conditions as at the MDC), Mr. Soborski's conditions of confinement have been and
will continue to be harsher and far more aggravated than in the typical case. He has suffered an
extraordinary punishment unforseen by the Sentencing Commission in setting the applicable
Guideline range, and the cases provide an ample basis for a departure or variance on these
grounds. *See United States v. Carty,* 264 F.3d 191, 196 (2d Cir. 2001) ("pre-sentence
confinement conditions may in appropriate cases be a permissible basis for downward
departures"); *Hernandez-Santiago,* 92 F.3d at 101 n.2; *United States v. Mateo,* 299 F. Supp. 2d
201, 212 (S.D.N.Y. 2004) (VM) (pre-trial abuse by prison guard warranted departure and
"effectively enhanced, to a disproportionate degree, the level of punishment contemplated to be
experienced by inmates in the typical case during the period of incarceration prescribed by the
Guidelines"); *United States v. Mendola,* 03-CR-449 (S.D.N.Y. 2005) (KMW) (reducing sentence
by one-third of the time spent in the MCC because of poor and unsanitary conditions,
overcrowding, inadequate bathroom facilities, inadequate medical attention and concluding that
"under Section 3553, some lowering of what would otherwise be his sentence is appropriate");
*United States v. Francis,* 129 F. Supp. 2d 612, 619 (S.D.N.Y. 2001) (RPP) (departing downward
based on defendant's thirteen and one-half month pretrial detention at facility where he suffered
severe physical and psychological trauma including restricted family visits "under qualitatively
different conditions than those of pre-sentence detainees in federal facilities"); *United States v.
Behr,* 2006 U.S. Dist. LEXIS 38349, at *12-13 (S.D.N.Y., June 14, 2006) (RWS) (sentencing
defendant to time served after pre-trial incarceration at MCC where conditions were
overcrowded, unsanitary, and lacks certain facilities, and rose to level of punitive rather than
administrative confinement); *United States v. Alvarez Castellanos,* 2006 U.S. Dist. LEXIS
76784, at * 9-12 (RWS), 2006 WL 3016313 (S.D.N.Y. Oct. 23, 2006) (discussing conditions
abroad and beatings by guards endured by defendant); *United States v. Trochtchenkova,* 05 Cr.
503 (SAS) (Oct. 11, 2006) (departing where defendant had no family in the United States);
*United States v. Salvador,* 2006 U.S. Dist. LEXIS 49543, at *14 (S.D.N.Y. July 19, 2006)

(LMM) (departing because of unsatisfactory conditions in pre-trial incarceration).  Even if it is not a basis for a formal departure under the Guidelines, Mr. Soborski's confinement warrants leniency in the court's 3553(a) calculus and counsels a sentence far less than that called for in the advisory Guideline range.

C.     Deterrence is Ill-Served By a Long Custodial Sentence

As the Court knows, in fashioning a reasonable sentence, it is supposed to consider the need to afford adequate deterrence to criminal conduct.  For too long, it has been reflexively assumed that a long prison sentence represents the best way to deter would-be drug offenders. We have been trying it for thirty years and have mostly failed.  An increasing amount of research now suggests that increased penalties for drug crimes have done little to dim the demand for illegal drugs, their supply in the marketplace, the purity and potency of the drugs themselves (which actually have decreased in price), and most significantly the supply of those willing to enter into the drug trade.  *See, e.g.*, National Research Council, "The Growth of Incarceration in the United States: Exploring Causes and Consequences," (2006, available at www.nap.edu) (discussing studies revealing diminishing returns for deterrent effect of longer sentences); Michael Tonry, "Purposes and Functions of Sentencing," 34 Crime & Just. 1, 28 (2006) (noting that "increases in severity of punishments do not yield significant [if any] marginal deterrent effects"); Christopher Mascharka, "Mandatory Minimum Sentences: Exemplifying the Law of Unintended Consequences," 28 FLA. ST. U. L. REV. 935, 947-79 (Summer 2001) (citing authorities); Michael J. Lynch, "Beating a Dead Horse: Is there any Basic Empirical Evidence for the Deterrent Effect of Punishment," 31 CRIME, LAW & SOCIAL CHANGE 347-49 (1999) (discussing studies and noting a "paucity of evidence favoring a connection between punishment and deterrence" and discussing data showing "no evidence of deterrence at the aggregate level"); Andrew von Hirsch et al, CRIMINAL DETERRENCE AND SENTENCE SEVERITY: AN ANALYSIS OF

11

RECENT RESEARCH 1 (Univ. of Cambridge 1999) (noting that the "studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects"). Deterrence is frequently offered as the *justification* for a longer sentence, but does little to actually explain the *need* for a longer sentence in the first place.

Those who have been prosecuted and incarcerated have been readily replaced by those waiting in the wings who are on notice that such conduct exposes them to heavy terms of imprisonment and run the risk regardless. Research shows instead that it is the *certainty* of punishment, rather than the *severity* of the resulting imprisonment that is more successful at achieving a deterrent effect. *See* Valerie Wright, "Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment," The Sentencing Project, Research for Advocacy and Reform (Nov. 2010) (available at sentencingproject.org). General deterrence as a rational theory of punishment also depends on an additional faulty premise that similar offenders are aware of the sentence imposed in a given case. That is as true here as in any other case; future wrongdoers both abroad and in the United States are unlikely to learn of the sentence that Mr. Soborski ultimately receives.

Here, few would be willing to risk the loss of a spleen and years of effective solitude in a foreign country, and for those who might, more imprisonment is unlikely to rationally dissuade them in any event. Relatedly, a long prison sentence as the reflexive application of the Guidelines range is unlikely to promote respect for the law. *See Gall v. United States*, 552 U.S. 38, 54 (2007) (quoting the district court's observation that a long sentence "may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment"); *United States v. Olhovsky*, 562 F.3d 530, 551 (3d Cir. 2009); *United States v. Stern*, 590 F. Supp. 2d 945, 957 (N.D. Ohio 2008). Respect for the law is better served by a

12

shorter sentence that actually reflects the nature of the offense and the individual defendant – all the immeasurable qualities that the Guidelines forsake in sentencing.

Lastly, deterrence should take into account as one element the principle of proportionality that considers Mr. Soborski's actual conduct of watching a boat and a plane and of providing (unarmed) security for what he believed to be drug-related meetings. Even if a longer prison sentence might achieve some deterrent effect, the Court still needs to link it as commensurate with the nature of the criminal conduct and Mr. Soborski's limited participation in it, and with his overall level of culpability – what *he* deserves and not what some future, unknown defendant otherwise merits. Taken together, these observations call into question the paradigm of a lengthy prison sentence as reflective of the need to deter others. To the contrary, they suggest that, to the extent present at all, deterrence is as well served by a shorter prison sentence as by a longer one, and that an unduly long prison term is greater than necessary to achieve this purpose of sentencing.

D.     The Guidelines' Focus on Quantity Does Not Reflect Mr. Soborski's Culpability

The Sentencing Guidelines, with their relentless focus on numbers and quantifiable means of measuring the immeasurable, take none of this into account whatsoever. The numbers, offense levels and guideline ranges create the illusion of precision where none exists. If only for that reason, the Guideline range here would be severely flawed and would utterly fail to reflect Mr. Soborski's history and characteristics. But their flaws are much more structural as well, for this case is another where the Guidelines' overemphasis on quantity at the expense of role would produce a term of imprisonment far longer than necessary, without any legitimate penological purpose. That is, Mr. Soborski's function of providing security or surveillance to what he thought was a drug-trafficking organization was sufficiently removed from the distribution

13

channels at the heart of the conspiracy, such that quantity is an especially poor proxy for culpability here.

Even though Mr. Soborski, as the Government and Probation recognize, satisfies the conditions for "safety-valve" eligibility under 3553(f) and is not subject to the ten-year mandatory minimum, all that "win" nets him is exposure to a sentencing guideline range that, if not draconian, is at least on the facts of this case, greatly excessive. Judge Gleeson called this conundrum getting out of the mandatory minimum frying pan only to get into the Guidelines fire. *See United States v. Diaz*, 2013 U.S. Dist. LEXIS 11386, at *2 (E.D.N.Y. Jan. 28, 2013). In that lengthy opinion, Judge Gleeson systematically exposed not only how quantity became the Sentencing Commission's primary determinant of the length of a sentence, but more important, how flawed and arbitrary drug weight is as a measure of the defendant's relative culpability.

The Commission set the drug guideline ranges against the backdrop of the 1986 Anti-Drug Abuse Act [the "ADAA"], whose penalty provisions were driven exclusively by weight and drug-type. *See United States v. Hayes*, 2013 U.S. Dist. LEXIS 80240, at * 15-36 (N.D. Ia. June 7, 2013); *Diaz*, 2013 U.S. Dist. LEXIS 11386, at *20-29. The five and ten year mandatory minimum terms in the ADAA were originally intended for "serious" traffickers (mid-level managers) and "major" traffickers (kingpins, organizers and leaders). *See Diaz*, 2013 U.S. Dist. 11386, at *19-32; *United States v. Hubel*, 625 F. Supp. 2d 845, 849-51 (D. Neb. 2008). Quantity was seen not only as a measure of culpability, but as a proxy for role: the more "serious" and "major" drug traffickers would generally be accountable for dealing in far greater quantities than their low-level or street-level counterparts and could be more readily identified and targeted by focusing on quantity. *See United States v. Dossie*, 851 F. Supp. 2d 478, 480-81 (E.D.N.Y. 2012) (citing legislative history). Among others, one flaw in this fundamental concept is that it fails

14

entirely to account for the nature of a drug conspiracy, whose members will typically have wildly disparate levels of culpability. However, a drug conspiracy was *not* originally among those offenses carrying a mandatory minimum, which were limited to substantive distribution and importation and exportation. But in 1988, Congress passed additional legislation adding a drug conspiracy as an offense carrying the five and ten year mandatory minimums the same as the substantive crimes that are the object of those conspiracies. *See Hubel*, 625 F. Supp. 2d at 850.

The Sentencing Commission, meanwhile, rather than relying on the data and past sentencing practices it had collected on drug cases, chose instead, largely for political reasons to anchor all drug guideline ranges to the quantities for the mandatory minimum terms established in the ADAA. *See Kimbrough v. United States*, 552 U.S. 85, 95 (2007); *Hubel*, 625 F. Supp. 2d at 849-51; *Diaz*, 2013 U.S. Dist. LEXIS 11386, at *28-30; *see also United States v. Thomas*, 595 F. Supp. 2d 949, 952 (E.D. Wisc. 2009) ("The Commission did not at the time of adoption explain how this scheme furthered the purposes of sentencing or otherwise justify the recommended sentences by reference to past practice or other research or study, and sentences in drug cases have increased far above pre-guideline practice"). The offense level for dealing in a threshold quantity of cocaine, for example five kilograms, was set to correspond roughly to the ten-year minimum that Congress established in the ADAA for trafficking in five kilograms of cocaine. Thus, weight became the sole proxy to assess culpability for all drug defendants, even though the ADAA established mandatory minimums only to target kingpins and mid-level managers, or the leaders and managers of drug organizations. *See Hayes*, 2013 U.S. Dist. LEXIS 80240, at * 31, 57; *Diaz*, 2013 U.S. Dist. LEXIS, at *28-29; *United States v. Woody*, 2010 U.S. Dist. LEXIS 72909, at *13-15 (D. Neb. July 20, 2010). All things being equal, a defendant who deals in five kilograms of cocaine is more culpable than one trafficking in 500 grams. However,

three decades of mandatory minimums and Sentencing Guidelines have taught us that "all things" are rarely equal in drug conspiracies.

In *Diaz*, Judge Gleeson discusses the folly of the policy choices instituted by Congress and the Sentencing Commission, and how the current approach is divorced from more proper sentencing considerations, producing outcomes out of all proportion with the relative wrongfulness of an individual defendant's conduct.  2013 U.S. Dist. LEXIS 11386, at *68-80. He focused on low-level participants like Mr. Soborski caught up in a much larger conspiracy involving an amount of drugs in which they have no proprietary interest or stake.  "Drug quantity is a poor proxy for culpability generally and for a defendant's role in a drug business in particular." *Dossie*, 851 F. Supp. 2d at 481.  If Judge Gleeson were an outlier, his concerns might be more easily dismissed, but he is hardly alone in his frustration with the quantity-driven guidelines regime and the injustices that result when weight is used as a proxy for culpability.

An increasing number of judges have expressed similar frustrations when sentencing similarly-situated defendants.  *See United States v. Cabrera*, 567 F. Supp. 2d 271, 276-77 (D. Mass. 2008) ("the Sentencing Commission has never explained how drug quantity is meant to measure offense seriousness, and significantly, how it correlates with the purposes of sentencing"); *United States v. Thomas*, 595 F. Supp. 2d 949, 952 n.1 (E.D. Wisc. 2009); *Hayes*, 2013 U.S. Dist. LEXIS 80240, at *52 ("Quantity is a particularly poor proxy for defendants who played a minor role in the drug trade"); *United States v. Nincehelser*, 2009 U.S. Dist. LEXIS 26219, at *19 (D. Neb. Mar. 30, 2009) (quantity is "not always a trustworthy measure of the culpability of an individual defendant"); *United States v. Cocoa-Vega*, 2009 U.S. Dist. LEXIS 44031 , at *7 (E.D. Wisc. May 26, 2009) ("In some cases weight may be a suitable proxy for

culpability, but in others it may lump together people who play significantly different roles in the operation which has troubled judges since the inception of the guidelines.").

Former Judge John Martin, whose frustration with the drug sentencing laws helped drive him from the bench, lamented that "these harsh penalties are applied without any thought about the level of involvement of the particular defendant in the narcotics distribution scheme." John S. Martin, Jr., "Why Mandatory Minimums Make No Sense," 18 N.D. J. LAW, ETHICS & PUB. POLICY 311, 317 (2004). Even the Commission itself acknowledged that drug quantity "has been called a particularly poor proxy for the culpability of low-level offenders, who may have contact with the significant amounts of drugs, but who do not share in the profits or decision-making." *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* 50 (November 2004).

If these observations are true in a mine-run drug conspiracy, they apply with even more force to Mr. Soborski, whose remove from the actual distribution renders the weight attributable to the fictitious drug organization a particularly exaggerated proxy by which to measure the wrongfulness of his conduct. *See Woody*, 20010 U.S. Dist. LEXIS 72909, at *25-26 ("[The defendant's] role was minor and . . . [i]n view of her attenuated role in the conspiracy, the quantity attributable to the overall conspiracy is not a reliable proxy for Woody's culpability"); *Nincehelser*, 2009 U.S. Dist. LEXIS 26219, at *17 ("In view of [the defendant's] attenuated role in the conspiracy, this is one of the cases in which the quantity determination does not serve as a reliable proxy for culpability"). When we look at what Mr. Soborski actually did, it puts lie to the notion that quantity can reflect a serious or worthy approximation of a defendant's culpability in this case. As discussed elsewhere, Mr. Soborski's role was essentially that of a lookout - conducting counter-surveillance as cocaine was purportedly loaded onto a plane and marine

vessels for importation into the United States.   Other than that, he did not assist in loading or actually transporting any cocaine.  He was not involved in any distribution, nor any transactions or negotiations, was not formally or informally a part of any drug trafficking organization, was not a stakeholder in the actual distribution and at most agreed to help facilitate importation.

Mr. Soborski's conduct is so far from the heartland conduct of a drug conspirator, to the extent the "heartland" concept even applies to drug cases – *see Diaz*, 2013 U.S. Dist. LEXIS 11386, at *9 ("The [drug] Guidelines ranges are not now, and have never been, the heartlands the Commission sought to establish"); *Hayes*, 2013 U.S. Dist. LEXIS 80240, at *58 ("The Guidelines range for methamphetamine offenses do not constitute the typical case or heartland") (citing *Diaz*) – that it makes little penological sense to apply a penalty scheme that was intended for such different conduct.  In terms of whether such conduct is sufficient for entry into a drug conspiracy, the law may make no distinction between Mr. Soborski's conduct and that of a heartland kingpin.  But for the purposes of sentencing and culpability, such distinctions are critical and risk being obliterated by the Guidelines' myopic focus on quantity as a proxy for role.

In short, given the nature of Mr. Soborski's role and function, quantity is an incidental and arbitrary measure of Mr. Soborski's culpability because it has no relation to his function and his role and to his intent to deal in any particular amount of cocaine.  A proper gauge of the relative wrongfulness of his conduct does not rise or fall according to the magnitude of narcotics involved because what he agreed to do had nothing to do with any particular quantity of cocaine. *See United States v. Staufer*, 38 F.3d 1103, 1106-07 (9th Cir. 1994) (questioning whether the "government has some reason to believe that defendants are predisposed to engage in a drug deal of the magnitude for which they are prosecuted").  Judge Bataillon of Nebraksa expresses this

18

thought with more eloquence: "The Guidelines' quantity-driven, 'market-oriented' approach is not a proxy for culpability in every case, nor does it always correlate to the purposes of sentencing in Section 3553(a). Drug quantity is only an accurate measure when it corresponds to a defendant's position in the typical hierarchy that characterizes most drug conspiracies. Where the defendant falls in this hierarchy is an important factor in the court's assessment of a defendant's ultimate culpability. *Hubel*, 625 F. Supp. 2d at 853; *see also Woody*, 2010 U.S. Dist. LEXIS 72909, at *28-29 ("Quantity can be one measure of the seriousness of a drug offense in the Guidelines market-based scheme, but when combined with a conspiracy offense involving multiple participants and an extended period of time, it is not always a trustworthy measure of the culpability of an individual defendant.").

Ironically, and also unlike other cases, the large quantity here was a *de facto* prerequisite for Mr. Soborski's peripheral involvement with the conspiracy. If the fictitious Colombian organization had not trafficked in large enough quantities, it would not have generated enough profits to hire Mr. Hunter's team of security personnel, and Mr. Soborksi would not have otherwise entered into a drug conspiracy. Put differently, Mr. Soborksi's limited role was a function of the ability to move large quantities, a role that would not have been possible but for large quantities. But to hold him accountable for that quantity as if he were a stakeholder in the actual trafficking misses the point and fails to reflect how tenuous his association in fact was.

E.    Reverse Sting and Sentencing Entrapment Considerations

A focus on quantity at the expense of role would be problematic enough if this case had involved a genuine conspiracy to import cocaine as opposed to a reverse sting manufactured by the government. But it cannot be ignored that the high amount of cocaine at issue here - between 150 and 450 kilograms – was fictive, and more so the product of the government's determination

19

of what was worthwhile rather than the product of Mr. Soborski's decision to involve himself in trafficking in specific quantities of contraband. In defending against attacks on its cooperators, the government frequently likes to point out that it was the defendants, not the government, that chose them (the cooperators). Here, in the same fashion, it was the government, not Mr. Soborski, that chose the numbers that it now contends should drive his punishment. Those numbers, far more so than in other cases, are nearly untethered to the relative wrongfulness of his actions.

Courts have been troubled by a sentencing scheme driven by quantity that allows the government, in a reverse sting, to effectively "structure sting operations in such a way as to maximize the sentences imposed on defendants." *United States v. Staufer*, 38 F.3d 1103, 1107 (9th Cir. 1994). In *United States v. Cortes*, 757 F.3d 850, 860-65 (9th Cir. 2013) the Ninth Circuit reversed a conviction on entrapment grounds and jury instructions stemming from a reverse sting, and included a lengthy discussion on the principle of sentencing entrapment, wherein a defendant pre-disposed to commit a lesser offense is induced by the government to commit an offense subject to greater punishment. *Cortes* recognizes that the government may structure reverse sting operations in such a way to arbitrarily inflate the amount of drugs involved in the deal (or stash house robbery) so as to maximize punishment without regard for the defendant's culpability. *See id.* at 860, 864 (quoting cases); *see also United States v. Caban*, 173 F.3d 89, 93-94 (2d Cir. 1999) (finding it "unsettling that in [a] type of reverse sting, the government has a greater than usual ability to influence a defendant's ultimate Guidelines level and sentence"); *United States v. Goodwin*, 594 F.3d 1, 5 (D.C. Cir. 2010) ("Manipulation of this sort effectively decouples drug quantity from culpability, thereby undermining one purpose of

20

the quantity-based sentencing ranges set forth in the Guidelines [and in the statutory scheme under Section 841].").

*Caban*, 173 F.3d at 93 n.1, and other cases have drawn a distinction between sentencing manipulation, which focuses on the government's conduct in increasing the defendant's sentence, and sentencing entrapment, which focuses more on the defendant's predisposition: "Sentencing manipulation has been described as occurring when the government engages in improper conduct that has the effect of increasing the defendant's sentence.  Sentencing entrapment normally requires that a defendant convince the fact-finder that government agents induced her to commit an offense that she was not otherwise predisposed to commit. (internal citations omitted).  *Caban* noted how the Guidelines recognized a potential for abuse in reverse stings but in too limited fashion, and invited the Commission to address more comprehensive measures to take into account when the government sets the bait.  *Id.* at 93-94.  But the Guidelines recognize explicitly only two forms of governmental manipulation - when the defendant lacks the intent or the ability (the "reasonable capability") to buy or sell an agreed-on amount, and when the government sets an artificially low price that allows the defendant to purchase in greater quantities than anticipated.  *See* U.S.S.G. § 2D1.1 cmt. app. n. 5 & 27.

Related to both sentencing manipulation and sentencing entrapment is the concept of "imperfect entrapment" as expressed in *United States v. Bala*, 236 F.3d 87, 92 (2d Cir. 2002).  There, the Second Circuit approved the practice of a district court departing downward on account of governmental conduct that may not legally rise to the level of entrapment, but that aggressively encourages wrongdoing on the defendant's part.  Such an approach is authorized under U.S.S.G. § 5K2.12, which recognizes a departure on the basis of coercion or duress.

Of course, whether governmental conduct is improper or outrageous is often in the eye of the beholder. If encouraging greater (fictional) quantities in order to secure greater (real) punishment is not improper, it is unseemly at best. Here, the government's conduct may not have given rise to an entrapment defense, and may not fit neatly into the categories of sentencing entrapment, sentencing manipulation, or imperfect entrapment, but the concerns that gave rise to those doctrines are just as relevant and hardly put to rest. "The danger of government abuse is great because in many cases, including this one, the government may influence and, in some cases control, the quantity and kind of a drug involved in the offense." *See United States v. Searcy*, 233 F.3d 1096 (8th Cir. 2000) (citing *United States v. Barth*, 990 F.2d 422, 424 (8th Cir. 1993)) (noting that the Guidelines have a "terrifying capacity for escalation of a defendant's sentence" on the government's prerogative). Moreover, such distinctions are less important in the era of advisory guidelines because after *Booker*, the same sentencing manipulation consideration that might have been a basis for a formal Guidelines departure could be an ample basis for a downward variance under Section 3553(a) because of the nature and circumstances of the offense. *See United States v. Beltran*, 571 F.3d 1013, 1019 (10th Cir. 2009). Thus, even if the government's conduct in fashioning this reverse sting does not entitle Mr. Soborski to any formalized relief under the Guidelines, the Court should not blind itself to the circumstances of how the offense and its quantities came about and how the government's central role in that process removes it from the heartland of other drug offenses.

F.    A Minor Role Reduction is Warranted

A minor role is an unusual concept here because none of the conspirators were involved in the sorts of paradoxical distribution activities performed by drug conspirators, and did not fill archetypical roles. *See* Mandatory Minimum Penalties in the Federal Criminal Justice System

22

166-67 (U.S.S.C. 2011) (establishing hierarchy of culpability in drug conspiracies based on typical roles including suppliers, organizers, manufacturers, wholesalers, managers, street-level dealers, brokers, couriers and mules); *see also Hayes*, 2013 U.S. Dist. LEXIS 80420, at *55-57. Even the more culpable members of the conspiracy were not truly involved in the distribution channels themselves or actual distribution.

Nevertheless, in the Second Circuit, the proper reference point (minor *compared to what*?) is not only the defendant's actual co-conspirators, but the "average participant in such a crime" as well. *See United States v. Rahman*, 189 F.3d 88, 159 (2d Cir. 1999); *see also United States v. Carpenter*, 252 F.3d 230, 235 (2d Cir. 2001). Thus, a defendant who plays a minor role compared to his actual co-conspirators but not relative to the average participant in a drug conspiracy will ordinarily not receive a mitigating role adjustment, at least in this Circuit. *See id.* But whether we consider only the actual co-conspirators or broaden the inquiry to include the average participant in a heartland drug conspiracy, Mr. Soborski is substantially less culpable than his co-conspirators, the average participants in *this* offense *and* the prototypical narcotics conspirator, and therefore merits a minor role adjustment.

In evaluating whether Mr. Soborski's role was minor for these purposes, the court considers, among other things, the "nature of the defendant's relationship to other participants, the importance of the defendant's actions to the success of the venture, and the defendant's awareness of the nature and scope of the criminal enterprise." *United States v. Yu*, 285 F.3d 192, 200 (2d Cir. 2002). Collectively these factors militate strongly in favor of the two-level adjustment. Mr. Soborski was on the periphery of both Hunter's organization and certainly the purported drug trafficking organization on whose behalf they were working. He was a hired hand, provided a limited function, was not integral to the success of the venture, and remained

23

largely ignorant of the scope and activities of the larger organization. He watched a boat and an airplane as they were purportedly loaded with cocaine. There is an ample basis for affording those in a security or lookout function a minor role adjustment as reflective of their relative culpability. *See United States v. Restrepo*, 936 F.2d 661, 665-68 (2d Cir. 1991); *United States v. Almanza*, 225 F.3d 845 (7th Cir. 2000); *United States v. DeMasi*, 40 F.3d 1306 (1st Cir. 1994); *compare with United States v. Parra*, 402 F.3d 752, 763 (7th Cir. 2005) (upholding denial of minor role adjustment for purported lookout who also was involved in transporting cocaine, accepting payment and effecting delivery of the cocaine).

It would be difficult for the government to argue that a minor role adjustment is not warranted where the Guidelines call for one where the defendant's role was exponentially more involved with the distribution itself (transporting or storing, per U.S.S.G. § 3B1.2 cmt. app n. 3). Likewise, couriers and mules will often be eligible for a mitigating role adjustment. *See, e.g.*, *United States v. Rodriguez*, 342 F.3d 296 (3d Cir. 2003) (reversing denial of minor role adjustment and noting that couriers and mules are often "small players" in the importation scheme eligible for the reduction despite their "integral" function in transporting the contraband[1]). If a defendant who *transports* drugs is eligible for a mitigating role adjustment, then a defendant whose conduct is at least one step removed from actual transport – only helping to ensure the security of the transport or shipment – is at least as entitled to a minor role adjustment. It would be likewise anomalous if those who were personally involved with real

---

[1] It might be gainsaid that without the sort of services Mr. Soborski conspired to provide, drug trafficking organizations might not be able to transport product as effectively, or function as efficiently. Even if that is the case, however, enabling and facilitating narcotics distribution or importation justifies the decision to charge him, and his decision to plead guilty and accept responsibility, *not* the imposition of a draconian sentence intended for drug traffickers themselves and those more directly in the chain of distribution, importation and manufacturing.

narcotics distribution are eligible for a mitigating role adjustment, but those who only tangentially connected to drugs that were fictional, were not.

Moreover, because the quantity involved was sufficient to incur a base offense level of 36, Mr. Soborski is entitled to an additional three levels off because of the mitigating role cap, such that his base offense level is effectively 33. *See* U.S.S.G. § 2D1.1(a)(5); *United States v. Leitch*, 2013 U.S. Dist. LEXIS 27796, at *30 n.28 (E.D.N.Y. 2013) (noting that defendant's "mitigating role reduction also operated to cap her base offense level, which would have otherwise have been 32, at 30"); *see also* U.S.S.G. § 3B1.2 cmt. app. n.6 (where the defendant's base offense level under 2D1.1 "was reduced by operation of the maximum base offense level in § 2D1.1(a)(5), the court also shall apply the appropriate adjustment under this guideline"). Thus, the three-level reduction in Chapter 2D1.1(a)(5) is *in addition to* and not an *alternative to* the two-level reduction for Mr. Soborski's minor role called for in Chapter 3B1.2.[2] *See Leitch*, 2013 U.S. Dist. LEXIS 27796, at *30 n.28 (noting that E.D.N.Y. "fast-track" policy for airport couriers, who receive four levels off for a minimal role "had the effect of reducing her Guidelines calculation by six offense levels").

Ultimately, however, the limited adjustments for role are insufficient to counter-balance or offset the skewing effect of quantity. For example, Judge Gleeson noted that there were 32

---

[2] When the Sentencing Commission promulgated that Guideline, it explained that the amendment "responds to concerns that base offense levels derived from the Drug Quantity Table overstate the culpability of certain drug offenders who meet the criteria for a mitigating role adjustment" and was intended to "somewhat limit[] the sentencing impact of drug quantity for offenders who perform relatively low level trafficking functions, have little authority in the drug trafficking organization, and have a lower degree of individual culpability." U.S.S.G. Amendment 640 (2002). Two years later, the Commission amended the Guideline again by providing a "graduated reduction" of two, three or four levels rather than a cap of 30 as a base offense level, which was in place from 2002 to 2004. *See* U.S.S.G. Amendment 668 (2004).

levels of differentiation as to quantity (ranging from offense levels 6 to 38), but only 8 as to role

(four of which were aggravating enhancements anyway, in the other direction).   *See Diaz*, 2013

U.S. Dist. LEXIS 11386, at *77-79; *see also Cabrera*, 567 F. Supp. 2d at 273 ("While

deductions for a defendant's minor role are available under the Guidelines, they are limited and

do not come close to offsetting the high quantity-driven base offense level"); *Thomas*, 595 F.

Supp. 2d at 952 (noting that minor role adjustment "did little to take account of defendant's

lesser role in the crime").   Here, even accounting for the mitigating role cap in 2D1.1, as well as

the additional two-level reduction because of Mr. Soborski's safety-valve eligibility (which does

not even require a mitigating role, but only the absence of an aggravating one), that adjustment

only comes to seven offense levels, which does little to offset the base offense level of 36 created

by considering quantity alone.

Where a minor role reduction inadequately reflects the defendant's peripheral

involvement in the offense, a further departure or variance may be warranted.   *See United States

v. Koczuk*, 166 F. Supp. 2d 757 (E.D.N.Y. 2001); *Thomas*, 595 F. Supp. 2d at 952; *United States

v. Jaber*, 362 F. Supp. 2d 365, 382 (D. Mass. 2005) (minor role adjustment "did not begin to

reflect defendant's position in the enterprise").   In practice, these sorts of accommodations and

adjustments are insufficient; they only tinker around the margins of a structurally flawed

enterprise, or as Judge Gleeson puts it, "amount to gnats around the ankles of the elephant."

*Diaz*, 2013 U.S. Dist. LEXIS 11386, at *38.

Further, because Mr. Soborski did not personally deal in *any* quantities, he is unlike low-level defendants who benefit from an adjusted offense level that reflects only the quantity with which they were personally involved rather than the cumulative amounts trafficked by the conspiracy as a whole.  The Guidelines themselves recognize that the appropriate calculation for a defendant who "performs a limited function in concerted criminal activity" sometimes excludes the quantities distributed by the larger conspiracy, and is limited instead to amounts "in which the defendant personally was involved."  *See* U.S.S.G. §3B1.2 cmt. app. n. 3; *United States v.*

*Roberts*, 223 F.3d 377, 381 (6th Cir. 2000); *Hernandez-Santiago*, 92 F.3d at 100 (distinguishing between quantity defendant agreed to distribute and the "entire amount of cocaine sold by the gang during the time he participated in the activities of the organization"); *United States v. Lucht*, 18 F.3d 541, 555-56 (8th Cir. 1994). Mr. Soborski's base offense level, however, reflects the entire conspiracy, not in spite of his distance from the actual channels of distribution, but *because of it*. Accordingly, the Court should be wary of unwarranted disparities among low-level offenders, some of whom personally deal in smaller quantities than the larger conspiracy, and the alternative framework that such a calculation provides as a superior approximation of the individual defendant's culpability.

F.    An Enhancement for Use of a Special Skill Is Not Warranted

The government and Probation are also wrong to apply the two-level enhancement for use of a special skill – purportedly Mr. Soborski's military training and experience – in a manner that significantly facilitated the commission of the offense. *See* U.S.S.G. § 3B1.3. Special skills are "not possessed by members of the general public and usually requir[e] substantial education, training or licensing." U.S.S.G. 3B1.3 cmt. app. n. 4. The Guidelines' examples of a special skill are instructive: pilots, lawyers, doctors, accountants, chemists, and demolition experts. *Id.* The drug guideline itself recognizes that "[c]ertain professionals often occupy essential positions in drug trafficking schemes. These professionals include doctors, pilots, boat captains, financiers, bankers, attorneys, chemists, accountants, and others whose special skill, trade, profession, or position may be used to significantly facilitate the commission of a drug offense." U.S.S.G. § 2D1.1 cmt. app. n. 23.

Soldiers, security contractors, or even snipers are not mentioned, and while such absence is not determinative, they are different in kind from the examples provided, which should be determinative. Moreover, the mere fact that soldiers or security officials receive training does not mean that the end product is a special skill. Training alone does not a special skill make.

In the Second Circuit's recent decision in *United States v. Kimber*, 777 F.3d 553 (2d Cir. 2015) an enhancement for use of a special skill was warranted for a licensed pharmacist whose

knowledge of chemicals and their effect on the human body (including that heating mercury caused it to vaporize and be inhaled) plainly facilitated the offense of dispersing mercury at an Albany hospital.[3]  Likewise, in *United States v. Reich*, 479 F.3d 179, 191-92 (2d Cir. 2006), the defendant used his special skill as a lawyer to craft a forged judicial order, thus warranting the enhancement after he was convicted of obstructing justice and making a false statement. Similarly, in *United States v. Downing*, 297 F.3d 52 (2d Cir. 2002), the enhancement applied in the case of an accountant who prepared false audit reports and who was recruited for the specific purpose of using his expertise in accounting.[4]

The reason military experience should not be considered a special skill is that for most of organized human history, compulsory military service was the norm.  If anything, special or extraordinary attributes were traditionally a reason *against* military service.  For men of a certain generation, only a few would not have had military experience.  In this country, involuntary conscription or the "draft" ended 40 years ago, and males are still required to register with the Selective Service.  In Poland, moreover, mandatory conscription was in place until 2008 or 2009, long after Mr. Soborski entered the service.[5]

---

[3] Kimber was convicted of possessing and using a chemical weapon (18 U.S.C. § 229(a)) and tampering with consumer products in interstate commerce (18 U.S.C. § 1365).

[4] Enhancing Mr. Soborski's sentence for use of a special skill smacks of cumulativeness or redundancy because his involvement in the conspiracy was essentially limited to the conduct that purportedly justifies the enhancement.  In effect, whatever special skill Mr. Soborski may have had was part and parcel of his base offense level in light of the nature of this drug conspiracy and his participation in it.  In light of Mr. Soborski's function, he would not have incurred responsibility for between 150 and 450 kilograms if he had not possessed a special skill.  Put differently, on the unique facts of this case, the special skill is all but included in the base offense level, in which case the Guidelines direct that the enhancement does not apply.  *See* U.S.S.G. § 3B1.3.

[5] See Matthew Day, "Poland Ends Army Conscription," *The Telegraph* (UK),  August 5, 2008; Nicholas Kulish, "As Draft Ends, Polish Military Faces Struggle to Modernize," *The New York Times*, December 11, 2008.

But even if it could be argued that Mr. Soborski's military and security background constitutes a special skill under the Guidelines, the Government would still need to show that he actually used that skill in a manner that significantly facilitated the commission or concealment of the offense. The Guidelines, after all, punish those who *use* special skills to commit the crime, not those who merely possess them and who commit a crime. When we look at what Mr. Soborski actually did, it is apparent that whatever special skill he may have possessed, it was not among those he brought to bear in committing the instant offense. Watching over a plane or a marine vessel is not a special skill, and is also not the sort of conduct that generally exposes a defendant to the sorts of severe penalties designed for major narcotics traffickers.

In effect, Mr. Soborski was a glorified security guard. What the government here calls "counter-surveillance" is little different from those it likewise describes in other drug conspiracies as "lookouts," *see United States v. Parra*, 402 F.3d 752, 761-63 (7th Cir. 2005) (establishing a functional equivalence between counter-surveillance and serving as a lookout), who have generally been adjudged to be less culpable than core conspirators, *see United States v. Restrepo*, 936 F.2d 661, 665-68 (2d Cir. 1991); *United States v. Almanza*, 225 F.3d 845 (7th Cir. 2000); *United States v. DeMasi*, 40 F.3d 1306 (1st Cir. 1994), find themselves at most on the outer margins of a conspiracy, and can hardly be said to wield a special skill to further the aims of the drug conspiracy.

## H.   The Aircraft Enhancement Should Not Be Applied

The government's conduct may not be sufficiently outrageous or improper to dismiss the indictment or to formally grant a downward departure, but as it is relevant to other considerations at sentencing discussed *supra*, it is also relevant to this offense characteristic. The Guidelines call for a two-level increase if the defendant "unlawfully imported [] a controlled substance under circumstances in which an aircraft other than a regularly scheduled commercial air carrier was used to import the controlled substance." U.S.S.G. § 2D1.1(b)(3). The government and Probation believe the enhancement applies because in June 2013, Mr. Soborski traveled to the

Caribbean and purportedly conducted "surveillance" of a U.S. registered or owned aircraft, as large quantities of cocaine were purportedly loaded onboard, under the DEA undercover's supervision, before it took off for the United States. They are both mistaken.

First, Mr. Soborski did not use a charter aircraft to import cocaine so much as the government used the aircraft to enhance his sentence. The private plane was an aspect of the conspiracy designed by government agents, not Mr. Soborski or the other co-defendants. They were not using aircraft in connection with this conspiracy independent of or prior to the government's activities. Mr. Soborski's conduct was thus no more egregious or worthy of additional punishment merely because the government decided somewhere that it would be advantageous to use a fake aircraft to further ensnare the defendants. As to Mr. Soborski, his culpability remains unchanged and even if the principles of sentencing entrapment or manipulation do not apply, the Court should simply decline to apply the enhancement.

It is not surprising that the purported use of private aircraft has little bearing on Mr. Soborski's culpability because like the drug guidelines overall, the aircraft enhancement was not the product of empirical analysis or the Commission's characteristic role, but of congressional posturing instead. Indeed, the Commission promulgated the aircraft enhancement specifically "to implement the directive to the Commission in Section 6453 of the Anti-Drug Abuse Act of 1988." U.S.S.G. Amendment 134. Thus, not only are the drug guidelines generally the product of congressional (over) reaction and not the Commission's inherent expertise, this specific enhancement is also plagued by Congress's meddling directive and did not originate from the Commission's institutional role. Accordingly, the Guideline and the specific offense characteristic warrant even less judicial deference than would otherwise be the case, even if the Court were to determine that it should apply.

30

The latter conclusion, however, is unsupported both by the plain language of the enhancement and the accompanying case law because neither Mr. Soborski nor any other member of the conspiracy actually used a private plane to import cocaine. The Eleventh Circuit held that the enhancement does not apply merely because the defendant intended to use a private plane but did not actually import the controlled substance. *See United States v. Chastain*, 198 F.3d 1338, 1353 (11th Cir. 1999) (remanding for resentencing based on district court's erroneous application of aircraft enhancement). The Eleventh Circuit found that "the plain language of the guideline that uses the past tense, viz 'used to import,' cannot be ignored. When the language of the guideline is clear, it is not necessary to look elsewhere for interpretation. Here, the language of the guideline clearly contemplates a completed event, an actual importation. That did not occur in this case. The Court will not look to the title of a guideline to explain what is quite clear in its text." *Id.*

The Ninth Circuit had previously reached the same determination in *United States v. Joelson*, 7 F.3d 174, 180 (9th Cir. 1993). The Court agreed with the defendant that it needed to give effect to the plain language of the Guideline. There, a private plane was used to fly cocaine into Guatemala, which was then transferred by DEA Agents to a commercial Pan Am carrier and then flown into the United States. *Id.* But the private carrier was *not* used to actually import the cocaine; only the commercial Pan Am flight satisfied that requirement. Accordingly, it was error to apply the enhancement. But the Court also explicitly rejected the government's argument that the enhancement applied because the defendants intended to use a private plane to import the cocaine, and found instead that the enhancement applies "only if an aircraft other than a regularly scheduled commercial air carrier was used to import the cocaine. It does not provide for an increase when the parties merely intended to use a private airplane." *Id*; *see also United States v.*

31

*Torres-Teyer*, 322 F. Supp. 2d 359, 365 (S.D.N.Y. 2004) (declining to apply enhancement where there was no evidence to suggest that defendants' plot to use private plane and airstrip succeeded after the shipment was seized by foreign authorities).

If the enhancement should not be applied, as in *Torres-Tyler*, where there was a real plot and real drugs, then it no sooner should be applied here, where the DEA's use of the airplane was as contrived as the existence of the drugs. It makes perfect sense that a defendant who actually uses a private plane to import cocaine might be more culpable than one who understood or even agreed – at the government's express urging – that a private aircraft would be involved. The government should not be in a position to unilaterally increase the defendant's sentence by choosing the means and manner of importation that policymakers have deemed more worthy of punishment. In any event, the extent to which Mr. Soborski was removed from actual use of the aircraft is also relevant. He neither piloted boarded or loaded the plane. His role in "using" the aircraft was to *watch* it. For all of these reasons, the Court should not apply the aircraft enhancement.

<u>Conclusion</u>

In light of these considerations, we respectfully ask the court to adopt the following Guidelines calculation:

| | |
|---|---|
| Base offense level: | 36 |
| Minor Role Reduction: | -2 |
| Mitigating Role Cap (§2D1.1): | -3 |
| Acceptance of Responsibility: | -3 |
| <u>Safety-valve Eligibility</u> | <u>-2</u> |
| | |
| Adjusted Offense Level: | 26 (63-78 months). |

A range of 63-78 constitutes a far more reasonable and just starting point or initial benchmark for the Court's determination of what is not greater than necessary to achieve the purposes of sentencing. It is, however, only a starting point. For the reasons stated above, the balance of the 3553(a) factors warrant a sentence shorter than six years. This is not a garden variety or heartland case, because of Mr. Soborski's background and characteristics, because of the Government's role in selecting the quantity that more than anything drives the sentence, and because of Mr. Soborski's highly attenuated role and distance from the core of a drug distribution or importation conspiracy. In addition, Mr. Soborski has already paid an unusually significant price for his actions even before being sentenced. Even after he is released, his ability to earn a livelihood – especially in the industry to which he has devoted his career – will be significantly curtailed because of his criminal record. A sentence that includes short additional period of incarceration is sufficient. Years and years of prison is greater than necessary.

Mr. Soborski's sister Beata Borecka poignantly gives a good perspective of the brother she knows:

*Slawek as a son and a brother has always been a good, honest and model person. He has been missed among us for 2 years, especially now as our father is suffering a terminal illness. Slawek has always cared for his parents, supported them mentally and gave them strength to carry on in difficult times. My brother has brother has been calm and carrying, he has always cared more about others then himself. He has always took care about his son, Michael. They have had a very close bond. As the son is now in difficult age, he needs his support, advice and guidance. Michael cannot accept the fact that his father is not present beside him. He is awaiting Slawek's return.* (See, Exhibit E).

33

A range of 63-78 constitutes a far more reasonable and just starting point or initial benchmark for the Court's determination of what is not greater than necessary to achieve the purposes of sentencing. It is, however, only a starting point. For the reasons stated above, the balance of the 3553(a) factors warrant a sentence shorter than six years. This is not a garden variety or heartland case, because of Mr. Soborski's background and characteristics, because of the Government's role in selecting the quantity that more than anything drives the sentence, and because of Mr. Soborski's highly attenuated role and distance from the core of a drug distribution or importation conspiracy. In addition, Mr. Soborski has already paid an unusually significant price for his actions even before being sentenced. Even after he is released, his ability to earn a livelihood – especially in the industry to which he has devoted his career -- will be significantly curtailed because of his criminal record. A sentence that includes short additional period of incarceration is sufficient. Years and years of prison is greater than necessary.

Mr. Soborski's sister Beata Borecka poignantly gives a good perspective of the brother she knows:

*Slawek as a son and a brother has always been a good, honest and model person. He has been missed among us for 2 years, especially now as our father is suffering a terminal illness. Slawek has always cared for his parents, supported them mentally and gave them strength to carry on in difficult times. My brother has brother has been calm and carrying, he has always cared more about others then himself. He has always took care about his son, Michael. They have had a very close bond. As the son is now in difficult age, he needs his support, advice and guidance. Michael cannot accept the fact that his father is not present beside him. He is awaiting Slawek's return.* (See Exhibit E).

We recognize the seriousness of the offense at issue and the need for the Court's sentence to further the goals of punishment and deterrence – as required by the Sentencing Reform Act of 1984, Pub. L. No. 98-473 Section 211, 98 Stat. 71987, 1989-90 (1984) (the "Sentencing Reform Act" or "the Act"). This submission respectfully requests that the Court also pay fealty to other sentencing goals within the construct of the Act in arriving at a sentence that is "sufficient but not greater than necessary" to fulfill the statutory mandate. We submit that consideration of the "history and characteristics" presented by the life of Slawomir Soborski – what the Supreme Court has described as the "unique study in the human failings that sometimes mitigate, sometimes magnify the crime and the punishment to ensue," *Koon v. United States,* 518 U.S. 81, 98 (1996) – suggests that in the case of Mr. Slawomir Soborski a sentence of 60 months or less accomplishes the goals of punishment and deterrence.

I can state without hesitation that Mr. Slawomir Soborski is truly and absolutely remorseful for his actions and I would respectfully ask Your Honor to take into account that his conduct in this case is distinguishable from every other co-defendant.

I thank the Court for its consideration of the issues presented herein.

Dated: New York, NY

October 8, 2015

Respectfully submitted,

William J. Stampur
Stampur & Roth
Attorney for Edson Rodriguez
299 Broadway, Suite 800
New York, NY 10007
(212) 619-4240

Encls.

cc:    Michael D. Lockard (via ECF)
       Anna M. Skotko (via ECF)
       Emil J. Boew III (via ECF)
       Emily P. Frankelis (via ECF)