G9desobs

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,              New York, N.Y.

 4              v.                          13 CR 521(LTS)

 5   SLAWOMIR SOBORSKI,

 6                 Defendant.

 7   ------------------------------x

 8
                                           September 13, 2016
 9                                         4:09 p.m.

10
     Before:
11
                        HON. LAURA TAYLOR SWAIN,
12
                                           District Judge
13

14                          APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     BY:  MICHAEL LOCKARD
17        Assistant United States Attorney

18   WILLIAM J. STAMPUR
          Attorney for Defendant
19
     INTERPRETER:  ANDRZEJ SIERGIEJUK
20

21

22

23

24

25
```

G9desobs

1              (Case called)

2              MR. LOCKARD:  Good afternoon, your Honor.  Michael

3    Lockard for the government.

4              THE COURT:  Good afternoon, Mr. Lockard.

5              MR. STAMPUR:  William J. Stampur for Mr. Soborski.

6    Good afternoon, your Honor.

7              THE COURT:  Good afternoon, Mr. Stampur.

8              Good afternoon, Mr. Soborski.

9              MR. STAMPUR:  May I be seated, Judge?

10             THE COURT:  Yes.  Please.

11             And so, Mr. Siergiejuk --

12             INTERPRETER:  Yes.

13             THE COURT:  -- you'll be interpreting from English to

14   Polish and vice versa?

15             INTERPRETER:  That's right.

16             THE COURT:  And so, Mr. Soborski, if you have any

17   difficulty understanding the interpretation at any time, please

18   raise your hand and we will address the issue.

19             Are you understanding the interpreter clearly so far?

20             THE DEFENDANT:  Yes.

21             THE COURT:  Thank you.

22             MR. STAMPUR:  Judge, just for the record, he speaks

23   English quite well.  But I think he'll feel more support when

24   he has the Polish interpreter.  So he may respond to some

25   questions in English also.  I just want to warn the Court.

G9desobs

1          THE COURT:   Thank you.   I thought that might be the

2   case, but this is obviously a very important proceeding.   So it

3   is best to have the services of the interpreter.

4          MR. STAMPUR:   Absolutely.

5          THE COURT:   So we are here today for sentencing.   I

6   have received and reviewed the presentence investigation

7   report, which is dated May 4, 2015, including the

8   recommendation and addendum.

9          I've also received and reviewed the defense's

10  October 8, 2015, submission, which was accompanied by a letter

11  from Wiwiana Grzybowska, W-I-W-I-A-N-A-, G-R-Z-Y-B-O-W-S-K-A; a

12  letter from Baeta Borecka, B-A-E-T-A, B-O-R-E-C-K-A; records

13  relating to Mr. Soborski's past employment and his resume; and

14  representative photographs of prison cells in Estonia, where

15  Mr. Soborski was held before his extradition to the United

16  States.

17         I have also received and reviewed a supplemental

18  submission from the defense and the government's submission

19  which is dated November 5, 2015.   The defense supplemental

20  submission was filed on September 6, 2016.

21         Are there any other written submissions that the

22  parties intend me to have considered in connection with the

23  sentencing?

24         MR. STAMPUR:   No, your Honor.

25         MR. LOCKARD:   Not from the government, your Honor.

G9desobs

THE COURT:  Mr. Stampur, have you read the presentence

report and reviewed it with Mr. Soborski?

MR. STAMPUR:  Yes.

THE COURT:  Mr. Soborski, has the presentence report

been read to you in Polish?

THE DEFENDANT:  Yes.

THE COURT:  And have you discussed it with your

attorney?

THE DEFENDANT:  Yes.  Yes.  Yes.  I'm sorry.

THE COURT:  You and your attorney have discussed the

presentence report, is that correct?

THE DEFENDANT:  Yes.  Exactly.

THE COURT:  Mr. Stampur, do you have any objections or

other issues with respect to the content of the report that you

wish to address at this time?

MR. STAMPUR:  No, your Honor.  I think some of those

issues will be addressed by the Court as a result of my

sentencing submission.  Is there a reason to bring them to the

Court's attention at this moment, or should I just integrate

them into my comments?

And by that, what I'm referring to is I asked the

Court to consider deleting or addressing multiple paragraphs

within the PSR that talk about the charges of his codefendants

with respect to assassinations and those related crimes.  And

the reason for that is twofold.  I thought that, number one,

G9desobs

1    even though I guess they're intertwined as an overall picture,

2    I consider them prejudicial to my client.  But I know your

3    Honor knows the entire picture of this case.

4            But more importantly, if it follows him subsequent to

5    today's proceeding, it may impact on his designation by the

6    Bureau of Prisons.  And I just didn't know how to address that,

7    because I thought it would be extremely unfair for that to

8    carry over to my client.  So that's one issue.

9            THE COURT:  All right.  So that's where I hoped to

10   start.  I would like you to be specific about the passages that

11   you would be asking to have deleted.

12           MR. STAMPUR:  Absolutely.

13           On page seven of my first sentencing submission, I

14   specifically point out that paragraph 26, 29 through 31, 42

15   through 45 and 51 through 64 address the things I just

16   referenced that are collateral to my client's participation in

17   his indictment and his role in this offense.  My research has

18   indicated that it's often the case that the Bureau of Prisons

19   will look at this, and there are public safety factors that may

20   be affected, as I just indicated.  And it could affect his

21   designation.

22           THE COURT:  All right.  So let's take those one by one

23   and see if the government objects.

24           Paragraph 26 does not say anything specific about

25   Mr. Soborski.  It discusses Hunter, Vamvakias and Gogel.

G9desobs

1          MR. STAMPUR:  That's why I actually thought it should

2     be deleted, because it has no bearing on my client.

3          THE COURT:  And so that's why I'm asking Mr. Lockard

4     why he objects.

5          MR. STAMPUR:  I'm sorry.

6          MR. LOCKARD:  Your Honor, I'm just pausing a moment.

7          THE COURT:  If you want to look at all of the passages

8     before you respond, that's fine.

9          MR. LOCKARD:  So I guess I have an overall response,

10    but rather than give the overall response, I'll give a response

11    directly to this paragraph, which is that it certainly is

12    relevant to the offense conduct of Mr. Soborski; because, as

13    described later in the PSR and including in several paragraphs

14    that Mr. Stampur has proposed be deleted from the PSR, the

15    offense conduct includes Mr. --

16          THE COURT:  Maybe you can speak a little louder.

17    Mr. Stampur seems to be having a little trouble hearing you.

18          MR. LOCKARD:  The offense conduct includes discussions

19    about violent acts.  It includes discussions about the

20    willingness to engage in those violent acts being part of the

21    purpose of recruiting the types of individuals who were

22    recruited to join the organization, which includes why

23    Mr. Soborski was considered and selected as one of those

24    individuals.  It includes Mr. Soborski's willingness to

25    participate in those acts of violence as one of the reasons

G9desobs

1    that he did ultimately join the team.  And the fact that

2    several of his colleagues so to speak did, in fact, continue on

3    to plan out those acts of violence is relevant to the overall

4    offense conduct and the course of conduct that Mr. Soborski

5    participated in.

6            So I think, while paragraph 26 doesn't specifically

7    mention Mr. Soborski, it sort of describes the conclusion of a

8    trajectory that was launched in a lot of the earlier meetings

9    and discussions that Mr. Soborski was a participant in, and

10   demonstrates that those discussions were not fluff or fantasy

11   or speculation.  They did, in fact, result in a very serious

12   plot; one that Mr. Soborski was not selected to participate in,

13   but that he joined the organization with the understanding that

14   that would be part of the responsibilities and that, when he

15   joined, expressed his willingness to engage in those acts.

16           So for those reasons the government thinks that

17   paragraph 26, though not specifically mentioning Mr. Soborski,

18   is nonetheless relevant to an evaluation of the overall offense

19   conduct that he did participate in.

20           MR. STAMPUR:  Just do you want me to comment on that?

21           THE COURT:  Just, Mr. --

22           MR. STAMPUR:  Okay.

23           THE COURT:  Mr. Stampur, I get to speak first, then

24   I'll let you speak.

25           MR. STAMPUR:  I'm sorry, Judge.

G9desobs

1          THE COURT:  So, Mr. Lockard, is the government

2    amenable to the deletion of any of the paragraphs that were

3    mentioned by Mr. Stampur?

4          MR. LOCKARD:  I think at this point, based on the

5    rationale that Mr. Stampur has advanced, no.

6          THE COURT:  All right.  Mr. Stampur, briefly?

7          MR. STAMPUR:  Your Honor, I take umbrage with

8    Mr. Lockard's comments.  And I might as well take this

9    opportunity to suggest that his comments are extremely

10   disingenuous.  And I'd like to go into the history of how my

11   client got involved in this conspiracy and how the government

12   has spun -- because it is their spin for him, especially in

13   their response to my first submission.  And that's why I

14   actually followed up some of those issues in my second

15   submission.

16          My client was recruited.  When I say "recruited," in

17   the normal scope of his employment -- because your Honor can

18   see from both the PSR and my submission that my client has been

19   employed as a security person throughout his 40-something years

20   and, in fact, prior to that worked for the Polish government.

21   And at the time of his -- the genesis of his involvement in

22   this case was in the normal procedure of his being at home at

23   his computer and getting an e-mail from a source that he didn't

24   know.  It wasn't Mr. Hunter at the time.  It was another

25   e-mail.  And it talked about if he wanted a job, he should come

G9desobs

1   to Thailand.  It involved a security, quote/unquote.  And

2   that's how it started.

3           And when he got to Thailand, which was the very first

4   step in this nightmare for him, he did meet Mr. Hunter, and

5   eventually he met some of the other codefendants at that time.

6   But the reality was that at no time, no time did he ever

7   express any desire, any interest, as the government knows, in

8   participating in this quote/unquote bonus work that they

9   reference so many times in their response to the probation

10  department in preparation for the PSR.  And, in fact, as time

11  went on, one of his codefendants, Vamvakias, even told the

12  agents, that that guy, we don't want him there, because he

13  removed himself from that scenario.

14          So I just don't get the spin where the government

15  wants to constantly say that he was involved in potential

16  violence, because, in fact, he wasn't.  And from the very

17  beginning, at the first meeting in Thailand, when he met with

18  Hunter for the very first time, and they had this collective

19  meeting, Hunter went on a tirade that I've seen the evidence,

20  where he talked about -- and I refer to it as braggadocio,

21  because he was referencing all these different things that he

22  had done in his life as a sergeant in the capacity of his own

23  untoward activities.  My client listened, and that's all.

24  There were times later when the confidential sources showed up

25  and he had a meeting with them, as they did with all the other

G9desobs

1    individual codefendants.  And they explained that this case

2    involved the potential of transportation of a lot of drugs, a

3    lot of drugs.  And my client, the only thing he ever responded

4    to in many of these colloquies was either da (phonetic) or yes.

5    He never expressed interest, and no time were there ever any

6    talk about arms, other than there's specific references,

7    constant references that the only thing you have to do is

8    provide security; you don't have to touch drugs.  And there are

9    a few references where they said, if we have to take somebody

10   down, are you willing to go along with it?  And he just said

11   yes.

12          Now, that being said, that's the extent of the

13   so-called violence that the government keeps saying my client

14   was involved in.  But to intertwine him with the other three

15   codefendants, who were eventually indicted on the alleged plot

16   to assassinate DEA agents, I think, is very unfair and is

17   disingenuous, because the facts specifically suggest that my

18   client went there for security.  And that's what he continued

19   to do during the entire life of this conspiracy, in Thailand,

20   in Africa and in the Bahamas.

21          At no time, at no time did he ever indicate that he

22   would do that.  In fact, he told the other codefendant he

23   didn't want any part of it.  And at one moment in the

24   Bahamas -- because that to me is the crux.  When that supposed

25   shipment was leaving the Bahamas to allegedly come to New York,

G9desobs

there was a meeting in a hotel, a motel.  My client wasn't

there for the majority of that meeting, where there were these

lengthy discussions about the follow-up in Liberia, which he

had already said I want no part of.  And then the government

references that, but they do know, and they have a video of him

coming in late from that meeting, sitting on the corner of the

bed, listening to what was discussed, not saying a word.

So how can they at this point in time say he was

involved in it?  Because he wasn't.  Never, ever.  So the

association with the codefendants is improper.  And I think

it's improper to collectively throw it into the PSR.  And I

think the facts speak for themselves.  It is what it is.

THE COURT:  Thank you.

Mr. Lockard, anything further?

MR. LOCKARD:  Yes, your Honor.

So Mr. Stampur said that it was improper for the

government to argue that Mr. Soborski was involved in the plot

to murder the DEA agent and the informant.  That is not what

we're arguing.  I want to make that clear.

What we are arguing is that Mr. Soborski intentionally

intertwined himself with an organization that he knew, because

it was expressed to him repeatedly, was involved in large-scale

drug trafficking and violence.  He knew that.

I submit that it is not plausible to suggest that he

didn't know that that's what he was traveling to Thailand for,

G9desobs

1    because he was hit over the head with it repeatedly when he got

2    there that this is the nature of the organization.  And he

3    didn't act surprised.  He didn't say, this is not what I signed

4    up for.  He expressed his interest and willingness to join that

5    organization, including specifically, when it was discussed

6    with him, acts of violence that he would be offered an

7    opportunity to participate in or may be asked to do.  And that

8    was by Mr. Hunter who expressed that to him.

9          And we recite, we quote some of the portions of the

10   transcripts of those meetings on pages five through ten of the

11   government's sentencing submission.  And Mr. Soborski

12   repeatedly expressed his willingness to participate in

13   facilitating drug trafficking and also acts of violence.  He

14   did not ultimately participate in that particular plot, but

15   when he joined the organization, he knew that that was the

16   nature of the organization he was getting into.  And he

17   expressed his willingness to participate in those activities

18   and then did, in fact, participate in the putative drug

19   transactions, leading up to right before the time that his

20   codefendants then further crystallized the murder-for-hire

21   plot.

22         So it's not like there's a clean division among these

23   five or six individuals, between people who were willing to do

24   violence and people who weren't.  They were all in the mix

25   together from the outset.  And then, as the course of conduct

G9desobs

1    went on, Mr. Vamvakias and Mr. Hunter and Mr. Gogel pursued the

2    plot to murder the DEA agent and the informant.

3            But I think it drastically misstates the nature of

4    what Mr. Soborski understood himself to be associating with to

5    try and excise references to violence out of the PSR.

6            MR. STAMPUR:  May I respond?  Because, Judge, you

7    know, we stand here in this sterile environment.  And you saw

8    the tapes, and you saw what really happened.  My client went

9    there -- and I think he misspoke again.  He went there not

10    knowing -- he assumed he was responding to his normal, standard

11    operating procedure for a job where he got paid for security.

12    Yes, he met Mr. Hunter.  Yes, there came a time when it was

13    explained to him that this involved a possible transportation

14    of drugs.  Yes.  Was that a mistake?  Absolutely.  He admitted

15    to that, and that's why he's here.  That's why he pled guilty.

16            But there came a time where he never recognized this

17    thing as an organization, quote/unquote.  That's why I say

18    sterile environment.  They met these two confidential -- the

19    two confidential sources who were introduced to them as

20    Colombian drug dealers.  And they had these meetings where

21    those sources did all the talking.  And they're working for the

22    government.  And they said, this is what possibly can happen.

23    This is what possibly can happen.  Do you understand?  Do you

24    want to participate?  And his response was, yes.

25            The reality is, as time went on -- and I don't want to

G9desobs

```
1    belittle the government's operation.  He recognized when they

2    told him the next day to go out and look at this boat, which he

3    did, he realized this was an -- I don't want to say the wrong

4    thing, the easy security job.  He got paid a substantial amount

5    of money, and there was no violence.  There was no weapons.

6    There were no drugs.  Then he left and he went home.

7         And then the next month they called him to go to

8    another place.  And he said, I'm going to make easy money

9    again.  And he went there and, once again, was all security.

10   There was no violence.  There was no talk about killing anyone

11   then in Africa.  And then he went back and they called him to

12   go to the Bahamas to make some easy money.  And they said, it's

13   going to be drugs going in on a plane.  And there was no talk

14   about violence.  He knew that there was references, don't get

15   me wrong, from Hunter and -- from Vamvakias and Gogel about

16   this possible bonus work.  He never participated, as the

17   government knows, and he wanted no part of it.  He just wanted

18   to make some easy money for this, quote/unquote, security.  And

19   he did that, and he was wrong.

20              THE COURT:  Thank you.

21              MR. STAMPUR:  You understand, Judge?

22              THE COURT:  I understand your argument.

23              MR. STAMPUR:  I'm just trying to give you the complete

24   picture.

25              THE COURT:  And I do understand the picture as you're
```

G9desobs

1    depicting it.

2           It is my conclusion, based on my view of all of the

3    material and my consideration of the remarks today, that the

4    record is clear that Mr. Soborski was aware that the activities

5    of the people and purported organization with which he was

6    associating himself did include violent activity; and that it

7    was represented to him that murders had occurred in aid of the

8    work or activities of the organization; and that other bonus

9    work assassinations were possible and, under certain

10   circumstances, being planned.  He indicated that he would be

11   willing to do that.  And so those aspects of the activities of

12   the organization are relevant to the overall picture of the

13   criminal activity with which Mr. Soborski voluntarily

14   associated himself.

15          Having said that, I will delete certain paragraphs

16   that don't place Mr. Soborski in particular conversations or

17   transactions.  Specifically, I am granting the application to

18   delete paragraph 26.  I will also delete paragraphs 44 and 45.

19   And I will delete paragraphs 53 through 64.  So that is my

20   ruling on that application.

21          I have read carefully the parties' submissions on the

22   issues of the aircraft enhancement, the special skills

23   enhancement and the application for a minor role adjustment.

24          Is there anything further that either counsel wishes

25   to say on those issues before I rule on those guideline

G9desobs

1   implication issues?

2          MR. STAMPUR:  There is nothing further I can say,

3   Judge.  I know you've read my submission so -- and I know

4   what's happened in the other codefendants' cases.  So I don't

5   think I have anything to add on those issues.

6          THE COURT:  Mr. Lockard?

7          MR. LOCKARD:  No, your Honor.  Unless the Court has

8   any further questions.

9          And I would also ask just a clarification.  I

10  apologize.  What was the last paragraph of the PSR the Court

11  indicated would be stricken?

12         THE COURT:  64.

13         MR. LOCKARD:  Thank you, your Honor.

14         THE COURT:  So I will now rule on the guideline

15  application issues.

16         First, with respect to the aircraft enhancement, I

17  find that that two-point enhancement is not applicable in this

18  case.  The guideline in question is written in terms of

19  completed conduct, and here there was no actual importation.

20  The importation of a controlled substance using an aircraft did

21  not actually occur.  Accordingly, that enhancement will not be

22  applied.  And I will direct that the probation department

23  delete paragraph 76 of the PSR and update the calculations in

24  paragraphs 81, 85 and 114 accordingly to reflect a total

25  offense level of 33.

G9desobs

1           As to the special skills enhancement, I find that the

2    two-point enhancement for use of special skills is applicable

3    and appropriate in this case.  Mr. Soborski was hired into this

4    criminal enterprise because of his military background and

5    training.  And that background and training aided him in his

6    activity in furtherance of the conspiracy; specifically, in the

7    provision of surveillance and countersurveillance.

8    Mr. Soborski qualified for his position within this

9    organization by offering and employing skills that he gained in

10   the military and relied on those skills.  The Court, therefore,

11   finds that the 3B1.3 enhancement is properly applied.

12           The Court has also considered the defense arguments

13   regarding the propriety of a minor role adjustment.  And the

14   Court finds that the facts of this case do not support the

15   application of Section 3B1.2B of the guidelines to include a

16   minor role adjustment.  There is significant evidence,

17   including transcripts of recorded conversations, demonstrating

18   Mr. Soborski's awareness of the full scope of the criminal

19   enterprise in this case, including, as I've mentioned a few

20   minutes ago, plans to commit murder for hire in furtherance of

21   the criminal enterprise.  And the evidence indicates that at

22   least at times Mr. Soborski indicated his willingness to

23   participate in such activities, although he was not ultimately

24   selected to participate in the particular murder-for-hire plot

25   that is a central aspect of the prosecution of some of his

G9desobs

1      codefendants.

2              This awareness of the scope of the activity that he

3      was protecting and, thereby, facilitating distinguishes

4      Mr. Soborski from a mere courier or low-level participant in a

5      larger criminal enterprise, which is the context envisioned by

6      Section 3B1.2 of the guidelines.  And indeed, comment 3(i) to

7      Section 3B1.2 indicates that a defendant's understanding of the

8      overall scope and structure of the criminal activity is a

9      factor worthy of consideration in determining whether a

10     defendant played a minor role.

11             And so once again, the evidence indicates that

12     Mr. Soborski was fully aware of the scope, structure and

13     overall nature of the criminal enterprise, including its use of

14     violence and of the volume of purported drug trafficking he had

15     been hired to protect.  And the application for a minor role

16     adjustment is denied.

17             The Court does find that Mr. Soborski satisfies the

18     conditions of Section 3553(f) of Title 18 and Section 5C1.2 of

19     the guidelines with respect to the safety valve, and therefore

20     the Court will sentence Mr. Soborski without regard to the

21     otherwise applicable mandatory minimum custodial sentence and

22     will credit the two-point offense level reduction.

23             Are there any other guideline application issues or

24     PSR content issues that we should focus on before the Court

25     hears general sentencing arguments?

G9desobs

1          MR. STAMPUR:  Not from me, your Honor.

2          MR. LOCKARD:  No, your Honor.

3          THE COURT:  Thank you.

4          Then, Mr. Stampur, I'd invite you to -- actually,

5     sorry.  There are just a couple of things.

6          Mr. Lockard, what is the government's position with

7     respect to forfeiture?

8          MR. LOCKARD:  Your Honor, as with the other defendants

9     in this case, the government would request at this time that

10    the Court enter a general order of forfeiture for all proceeds

11    received by the defendant as a result of his participation in

12    the offenses of conviction.  And we will, in consultation with

13    Mr. Stampur, endeavor to submit a written forfeiture order for

14    the Court's consideration.

15         THE COURT:  Any objection?

16         MR. STAMPUR:  No, your Honor.

17         THE COURT:  Very good.  I will do that.

18         And is the government applying to have Mr. Soborski

19    credited with the third point for acceptance of responsibility?

20         MR. LOCKARD:  We do apply.

21         THE COURT:  That application is granted.  And the

22    third point is already reflected in the computations in the

23    PSR.

24         So now, Mr. Stampur?

25         MR. STAMPUR:  I apologize for my prospective

G9desobs

1    redundancy, Judge.  When I was preparing a few notes for

2    today's sentence, I was working on my computer.  And I thought

3    of when I first met Mr. Soborski, and we had a very lengthy

4    discussion about why I was meeting him in the MDC.  And his

5    response was, because I once answered an e-mail on a computer.

6          And I've already sort of touched upon it a few moments

7    ago, because when he responded to that e-mail on his computer,

8    it was a very normal procedure that he had utilized in that

9    recent past, almost four years ago, to secure employment all

10   over the world.  And then this odyssey began.  He responded to

11   that e-mail from, as I indicated before, from -- I forgot the

12   source.  It wasn't Hunter's name.  It was Jim something.  And

13   he said, I can provide money.  Come to Thailand, and I need you

14   for security.  And that was the beginning of this odyssey.

15         But prior to that, I mean, that e-mail response was --

16   it was in his normal surroundings in Poland, where he lived

17   with his -- well, he has a teenage son, working class parents,

18   one of the women who he referenced before, thinking really

19   nothing of it, but here's another job; another job that was on

20   top of his life.  When you talk about this aberration -- and

21   this was mistake with a capital M, it really is.  It really is

22   an aberration for someone like himself.  That's why I suggest

23   to the Court, he is distinguishable from all of the other

24   codefendants, including Mr. Filter, who had a connection to

25   Gogel.  He had connection to no one.

G9desobs

1          And prior to that, because he's older than everyone

2    else -- he's in his 40s -- his whole life was dedicated to

3    upholding law and order.  He left his own home because they

4    live in a small house -- his sister, his two working class

5    mother and father -- and it got too crowded.  When he was 19,

6    he said, you know what?  I'll go into the military.  And that's

7    where it started.

8          And it piqued his interest to get involved with the

9    airborne and everything else that followed.  And he did that

10   for so long, and he got to be part of their antiterrorism unit.

11   He guarded the president of Poland.  He guarded George Bush

12   when he came to visit.  He guarded the Pope.  But he was in the

13   background.  He was one of those people who everyone felt

14   secure with.  And he was a professional.

15         And then at some point he said, I can utilize my

16   skills in a different capacity.  He followed someone else's

17   suggestion.  And he ended up securing the life of an emirate's

18   son in the Middle East.  He was on a tanker, oil tanker,

19   defending against piracy.  He went to Haiti to work for a

20   company.  He had a Canadian connection who sent him around the

21   world, everything on the up and up, and the majority of them in

22   a response to an e-mail.  This e-mail, the nightmare e-mail --

23   he always said to me, I wish I wasn't home.  But he was home,

24   and he made the gargantuan mistake that brings him before the

25   Court today.

G9desobs

1          And just to exacerbate his situation -- and that's why

2    I changed my request to the Court.  I know it's -- in Estonia,

3    when the government decided it was time to take these guys

4    down, he was asked to come to Estonia.  And Filter also went

5    there.  And for no reason, with the DEA agents standing close

6    by, he was attacked by, not them, the Estonian authorities.  I

7    know the government knows this because it took place in front

8    of their own witnesses.  And for no reason whatsoever, the end

9    result was after they threw him in the car and took him to

10   some -- I guess what you call precinct, and he couldn't move

11   his legs.  He had lost his consciousness.  He was bleeding.

12          They then recognized that they better get him to a

13   hospital.  And he had emergency surgery in Estonia.  They

14   removed his spleen.  They thought they stopped the bleeding.

15   And he was there for like one day, and then they threw him into

16   this prison, which is a vestige of -- I don't know how many

17   centuries ago, that's why I gave you some pictures.  And he was

18   there in solitary confinement, no follow-up medical care, and

19   with a hole in the wall for a bathroom.  And after three or

20   four months, one of the guards saw how bad he was and got him

21   into an adjoining facility in Estonia; not much better, but

22   never had any medical treatment.

23          Now, he comes to Vienna, DC.  And the first time I

24   meet him he complained about -- he has a scar that, your Honor,

25   goes from this part of his chest, top of his chest down to the

G9desobs

lower part of his abdomen.  And he showed it to me, and there

was some swelling already.  And I said, are you getting medical

care here?  And he said, I put in a call for the doctor.

     To make a long story short, one of the reasons the

sentence has taken so long, as the Court knows, is that

eventually he got him to a local hospital in Brooklyn.  And the

surgeon saw him and said, you need immediate surgery.  That was

like a year, 18 months ago.  They shipped him back.  That

surgeon, though, stayed within the picture.  And I spoke to

him.  And eventually, eventually, after two to three other

appearances in that hospital, they performed corrective surgery

on what took place in Estonia.

     That being said, his time here in the MDC has been

horrendous.  And to add to that, at some point this gentleman

who, as you can see from his resume and everything else, who

prided himself on his physical stature and his physical

condition, who was affected dramatically, who sometimes would

drag himself into the interview room with me, he fell in the

shower and tore his knee.  So at one point we laughed together

because he still was suffering from his stomach pains and he

was suffering from his knee.  Both of those have been

corrected.

     That's why I want to explain to the Court the multiple

requests for adjournments, because once I made a connection

with that one surgeon, he suggested that, don't let him get

G9desobs

 1    sentenced, I will correct this; because if he gets sent

 2    somewhere else, the whole process will start all over, and I

 3    know what to do.  And I even said for the very last time in the

 4    first week or so, even though he's rehabilitating his knee, he

 5    feels better.

 6            But as he's constantly pointed out to me, why did they

 7    have to do that in Estonia?  I don't know.  And I'm sure no one

 8    has an answer for it.  He's indicated to me many times that in

 9    his capacity as a law enforcement person, he's handcuffed and

10    taken hundreds, thousands of people, he says, into custody.

11    He's never used extreme violence.  He knows what to do.  And

12    that day, he cannot explain why they reacted that way.

13            THE COURT:  That is a horrible thing.

14            MR. STAMPUR:  It is a terrible thing, Judge.  And I

15    tell you that because Mr. Soborski has said to me many times,

16    I'm ready to accept punishment for what I did with the drugs.

17    I understand that.  I broke the law.  But I'll never be the

18    same physically.  And I would take so much more time if I could

19    have my physical capabilities and my body back.  And I said,

20    well, it is what it is and life goes on.

21            And that's why this odyssey, his difference from all

22    of the other codefendants I think -- from my perspective,

23    obviously, and I'm somewhat prejudiced, is something for the

24    Court to consider.

25            THE COURT:  I hear you, and I do understand.  And I am

G9desobs

1    taking it into account --

2              MR. STAMPUR:  I understand.

3              THE COURT:     -- in my consideration.

4              MR. STAMPUR:  I understand, Judge.  I appreciate it.

5              He has no one in the country, your Honor.  I pointed

6    it out.  I've acted as best as I can as sort of intermediary.

7    His family periodically will send it to me.  I'll put it into

8    commissary.  He doesn't have -- he has no other context, so I'm

9    his -- whatever, lifeline, so to speak.

10             And here he is.  And all he wants to do is attempt to

11   rehabilitate his knee, attempt to get his physical being back

12   to whatever it will be, as best as it can be, and go home.  And

13   I think the Court -- my lengthy submission I think speaks

14   wonders of the other issues about him and his prior life.  And

15   when I say an aberration, it's with a capital A in this case.

16   It doesn't in any way, shape or form justify why he continued.

17             So many times he said to me, I should have left, I

18   should have left.  And you know what?  The reality is -- and I

19   said it before, I really believe this:  When he saw it was easy

20   money, and when he said, just security, take a picture of the

21   boat, he took a picture, Judge.

22             For what it's worth, he said, I was never committing

23   violence on anyone.  And, in fact, I'm telling you, Judge, the

24   government knows, his codefendant didn't want any part of him.

25   When they talked about the bonus, Vamvakias said, he's not part

G9desobs

1    of it because he -- I don't want to express -- he doesn't want

2    anything to do with that.  But here he is, Judge.  He was

3    surrounded by people who were doing bad things and potentially

4    who were going to do worse things, and they did.

5          But lastly, even when he was in Thailand and in Africa

6    and in the Bahamas, he stayed to himself.  He was a real loner.

7    I know he associated with those guys, but he really didn't --

8    he didn't feel comfortable.  He didn't want anything really to

9    do with them.  I mean, that's sort of a contradiction in terms,

10   but he recognized early on and told me that he didn't totally

11   understand them.  He didn't consider them to be professional.

12   On the other hand, he went there and he accepted the money they

13   gave him.  And here he is, Judge.

14         I don't know what else I can say.  I'm just trying to

15   give you his picture and what really happened at those

16   different locations.  They were short-lived.  It was in the

17   Bahamas a few days, and he was in Africa a few days.  And prior

18   to that, he was in Thailand for a few days, and then they would

19   go back home.

20         THE COURT:  Yes, you've explained that earlier.

21         MR. STAMPUR:  I know, Judge.  I'm sorry for being

22   repetitious.  I got excited because -- anyway, I don't think I

23   have anything further to say.  If you have any questions of me,

24   I'm more than willing to answer some.

25         THE COURT:  You've been quite thorough here and in

G9desobs

1   your submission, Mr. Stampur.

2          MR. STAMPUR:  Thank you, your Honor.

3          THE COURT:  Mr. Lockard?

4          MR. LOCKARD:  Your Honor, the government's remarks are

5   going to be focused on the part of this case that we think is

6   most important from a sentencing consideration, which is the

7   nature and seriousness of the offense and the role that the

8   defendant's personal history and characteristics play into the

9   seriousness and the dangerousness of this particular offense

10  and this type of offense.

11          Mr. Stampur said that the defendant approached this

12  thinking it was any routine, ordinary international private

13  security job.  I don't think the record supports that

14  assertion.  In Mr. Soborski's initial e-mail to Joseph Hunter,

15  who was the head of the security team, who was an individual

16  who had been associated with the organization for many years,

17  is an individual who had personally participated in and

18  supervised acts of violence, including murders on behalf of the

19  organization, when Mr. Soborski reached out to Mr. Hunter, he

20  acknowledged that he had been referred by a friend of

21  Mr. Hunter's who had been in the French foreign legion and was

22  submitting his resume to Mr. Hunter.

23          He wasn't sending a resume to a multinational

24  corporation.  He wasn't sending a resume to a company that you

25  can look up on the Internet.  He was sending one to Joseph

G9desobs

Hunter, who was an international mercenary; who was somebody

whose responsibilities and job function was to plan, recruit

and supervise acts of violence.

THE COURT:  Do you have any specific evidence

indicating that Mr. Soborski was aware of Mr. Hunter's

extensive history as a violent mercenary?

MR. LOCKARD:  So we don't have the communications that

Mr. Soborski had with Mr. Hunter's colleague from the French

foreign legion, but here's what we do have:  We have the fact

that Mr. Soborski is the one who proactively sent his resume to

Mr. Hunter.  We have the fact that when Mr. Soborski arrived in

Thailand, he was immediately told the nature of the

organization he'd be working with.  He was within the first two

days advised by Mr. Hunter himself a lot of significant and

disturbing facts about Mr. Hunter's personal history and his

past work.

And he sat in meetings, both with Mr. Hunter and with

the confidential sources, who were holding themselves out as

cartel members, where he was advised individually, directly and

repeatedly about the nature of the organization, the nature of

the work, the violence likely involved in the work, the vast

scope of the drug trafficking that would be involved.  And he

never flinched.  He never batted an eye.  In fact, he

affirmatively verbally acknowledged his awareness of it and his

interest in participating in it.

G9desobs

1          None of that is consistent with being taken by

2     surprise by the nature of the organization.  I can't say that

3     he had full awareness of all that before he went in, but it is

4     not credible or plausible to suppose that he thought this was

5     an ordinary, legitimate job before he arrived, and right away

6     acknowledged his interest in participating in the

7     organization's activities.

8          He then participated in work on behalf of the

9     organization not once or twice, several times, and in a way

10    that shows the degree of involvement and commitment and really

11    lack of -- it's not a mistake, right?  He regrets it now, I'm

12    sure, but none of his actions were mistaken.  He intentionally

13    traveled to Thailand.  He intentionally traveled to Mauritius.

14    He intentionally traveled to the Bahamas.  He intentionally

15    traveled to Estonia.  For a period of six or seven months, he

16    trotted the globe to engage in work for this organization.

17         He did so in the company of other men that he knew

18    were former military members like himself, from Germany and

19    from the United States.  He was physically present for the

20    purpose of providing personal security at meetings that the

21    confidential sources had with other real-life drug traffickers

22    who were also investigative targets as they sat in Mauritius

23    and discussed additional drug trafficking activities involving

24    multi-hundred kilogram quantities of cocaine.  He participated

25    in countersurveillance of individuals who he knew -- because it

G9desobs

1    had been described to him by the confidential sources, men that

2    he knew were involved in international weapons trafficking.

3    None of this is accidental.  This is not a momentary lapse of

4    judgment.  This is a sustained, lengthy course of conduct with

5    lots of intentional actions, affirmative actions on

6    Mr. Soborski's part to participate in that.

7            I'm going to credit Mr. Stampur's explanation for why

8    Mr. Soborski did it.  It was easy money.  We don't think that's

9    particularly mitigating in the circumstance, because easy money

10   is sort of the very reason why people participate in drug

11   trafficking to begin with.  It is the universal motivation for

12   joining organizations like this, for participating in this kind

13   of activity; because it can be very lucrative.

14           But that doesn't diminish how dangerous it is.  It

15   certainly doesn't diminish how dangerous it is for someone like

16   Mr. Soborski, who was highly trained, who was highly qualified.

17   I would say he is the most highly trained, highly qualified

18   member of this team, short of Mr. Hunter himself, who had 20

19   years in the US Army.

20           But to take that kind of public trust and public

21   responsibility and public investment, provide it to an

22   individual for the purpose of providing security and safety for

23   a nation and its citizens, to then take those skills and those

24   resources and betray them and then turn them against the very

25   principles that he had been trained to protect makes that

G9desobs

conduct, first, the moral reprehensibility reflected by the

betrayal, but second, the dangerousness of it.  International

drug trafficking organizations are dangerous by definition.

Not only do these organizations spread the corrupting influence

of illegal narcotics throughout the world, but they also spread

corruption and violence.

     And Mr. Soborski joined what he understood to be just

that type of organization for the purpose of lending his

training and his skills as a former member of the military, a

former counterterrorism official, someone highly trained in the

use of weapons and hand-to-hand combat, to lend those skills to

that organization and support and promote its activities.

     And so for all those reasons, the government submits

that it's important that this sentence, like the sentences of

Mr. Soborski's codefendants, reflect the nature and seriousness

of that conduct in this offense.

     MR. STAMPUR:  May I be heard briefly, Judge, in

response.

     THE COURT:  Very briefly.

     MR. STAMPUR:  I can repeat myself.  When he went

there, he did not know -- as the government has indicated, they

have absolutely no evidence that he knew what was going on.

And, in fact, when Hunter meets for the very first time -- they

have that evidence -- Hunter was explaining to him and to the

other codefendants who he was and what this whole thing was

G9desobs

1   about.  So their own evidence shows that everyone was then for

2   the very first time finding out what was going on, because he

3   didn't know what was going on until he got there.  That's

4   number one.

5         And we never denied that he's made these mistakes, but

6   to generalize about worldwide drug trafficking is just not

7   fair, because, I'll say it again, each case rises and falls on

8   specific facts and the dynamic of what transpires at that time.

9   So when he got there -- and I'm trying to give the Court the

10  best picture I can -- and he saw what this thing was about --

11  and braggadocio is the word I use, because Hunter was talking

12  about this and that.  And he just listened, didn't say a word.

13  So to throw that --

14        THE COURT:  Mr. Stampur --

15        MR. STAMPUR:  It's not fair.

16        THE COURT:  Mr. Stampur, he stayed.  He worked

17  repeatedly for the organization.  He didn't say, you aren't the

18  kind of people I want to be with, you aren't the kind of people

19  whose needs I want to help serve.  He didn't leave.

20        MR. STAMPUR:  That is true.  I'm just trying to show

21  the Court that -- yes, he did that --

22        THE COURT:  I hear you, and I wanted to make sure that

23  you hear me.

24        MR. STAMPUR:  I want to tell you, though, the

25  confidential sources constantly said for him, you're here for

G9desobs

security.  You're here for security.  And he stood there.
That's all he did.  He stood there, and he got his money, and
that was the security.

He did take pictures of boats.  They told him to go
out and take a picture of a boat.  He did that.

THE COURT:  I hear you.

MR. STAMPUR:  You understand, Judge?

THE COURT:  Yes, I do.  I do understand what you're
saying.  Thank you.

Mr. Soborski, do you wish to speak on your own behalf
before I decide on your sentence?

THE DEFENDANT:  Initially I wanted to thank
Mr. Stampur for representing me.

(In English:)  I'm really sorry.  I speak Polish and
English.  Some people tell me better, I see.  Okay.  Twenty
months ago I plead guilty.  One months ago before I go to
meeting --

THE COURT:  If you're going to speak in English, I
need you to speak a lot slower.  Probably even if you're
speaking in Polish, you have to speak slower, so that I can get
all of your words.

THE DEFENDANT:  Twenty months ago I plead guilty for
providing security, okay, draft notification, how many notes,
Colombia cartel, yes.  One month ago I plead guilty.  I go with
Mr. Stampur to taking responsibility with security --

G9desobs

1              THE COURT:  I think it's probably better if you do

2    this in Polish and let the interpreter speak.  Thank you.

3              THE DEFENDANT:  Twenty months ago I pled guilty.  I

4    was in private security for the Columbian organization.  One

5    month before I pled guilty as my attorney, Mr. Stampur, we met

6    with -- together we met the prosecutor for the safety valve.  I

7    don't know how you call it, actually.  I said, Mr. Prosecutor

8    asked me -- several questions of me regarding what my position

9    in the group was.  When he asked questions, I told him it was

10   exactly what it was, how things were.  That is true.  I am the

11   former antiterrorist senior in Poland.  One can compare that to

12   your Navy SEALs.

13             A dozen or so times here, the prosecutor asked the

14   question, Mr. Soborski, so your experience and the skills are

15   twice as much Hunter, Gogol, Filter and Vamvakias has.  Why

16   didn't you take this bonus job?  I give the short response.  I

17   had the agreement with Mr. Hunter, but before that it was the

18   jimmy rigger.  I'm not interested in that kind of job.  As far

19   as narcotics are concerned, likewise, I was not interested in

20   the gaining any profit from narcotics.  My job was supposed to

21   be security only.  Maybe it is complicated.  But for people who

22   do that kind of work, it is not complicated.

23             Because my response is short.  American company,

24   Blackwater, back in 2006, Fallujah, there were 16 innocent

25   people killed on the street.  On the same day they were

G9desobs

1  transported back to the United States.  They never faced the

2  Iraqi court.

3          Back in 2009, I received a reply from the American

4  company, I believe that was the Bridgestone.  The question, are

5  you interested in work in South America?  And I asked, what was

6  the nature of the job?  And it's fighting guerrillas.  I was

7  not interested, because in Poland gorillas are perceived as the

8  heroes, guerrillas.

9          Was also another thing.  The prosecutor asked me, why

10  didn't I leave the group?  What's wrong -- what wrong did I do?

11  I was sitting all by myself in the villa, and they were

12  bringing money to me every month.  And what about my skills and

13  the experience?  No one saw what my skills are.  And since, you

14  know, taken a dozen or so pictures from an iPhone of this boat,

15  you know, that does not count as the surveillance of the boat.

16  To me doing surveillance, that means doing something when

17  you're hidden and not doing something in broad daylight.

18          I would like to put this to an end, but there are a

19  lot of things that I would like to say.  But if I did that, you

20  know, all of this was -- would be dragged out.  This we can end

21  this case here today, but this case in Estonia will still be

22  open.  And why?  Because when I was arrested in Estonia, and

23  the consul came to me, and he asked me, what was the basis for

24  my arrest?

25          My response was that, well, it was my participation in

G9desobs

a group.  And he told me that it was not.  He said that the US
government sent the information to the Polish media that I was
the gun for hire and also that I profit from narcotics.  And
when he received the documents that I myself received from the
Estonia document, it had these indictment papers.  The
indictment itself mentions narcotics only.  And at that time,
around that time, the Polish TV aired the documentary about me,
about my history, about my career that I had in the special
forces.  And the Polish government was very upset because of
the actions taken by the US government.

And the consul sent the letter to the American
ambassador and also to the Estonian ambassador and also to the
US Embassy.  And the response from the Estonian government was
that they were not doing such things.  And there was no replies
from US Embassy.  So response is simple:  Hence the ambassadors
was not able to find out what happened about -- in connection
with my surgery when this emergency surgery was performed.

I myself also received no reply for seven months about
that.  My first day after arriving here to the United States --
and as Mr. Stampur mentioned about that.  And Mr. Stampur asked
me what happened with me back in Estonia.  What was it that was
operated on?  What happened?  And the response from the
prosecutor was very swift:  During the arrest, Mr. Soborski
lost his spleen and he was operated on.

I asked Mr. Stampur dozens of times, maybe thousands

G9desobs

 1    of times, who was responsible for this -- for my spleen, for my

 2    health issue?  Because there will be an indictment against the

 3    Estonian government in connection with that.  And the worst

 4    thing is that I received a copy of this report of

 5    investigation, and that was prepared by these DEA agents who

 6    were present in Estonia.  And that report was prepared five

 7    days following my arrest.  There is no mention of this.  There

 8    is nothing.  None of it says about what happened to

 9    Mr. Soborski.

10          THE COURT:  Mr. Soborski, today my responsibility is

11    to decide on your sentence for your conduct.  And this criminal

12    case is not the case about any potential claims against anyone

13    else or any other government regarding the attack on you.  And

14    I have nothing to do with the diplomatic communications and the

15    communications between the various agencies.

16          So I would like you to conclude your remarks by

17    focusing on what you want me to know about you and what you

18    want me to consider in sentencing you.

19          THE DEFENDANT:  What else can I say?  I agreed to be a

20    security detail.  And I was paid for the hours for providing

21    security.  But I became a drug dealer.

22          Your Honor, if you do read my whole life history and

23    my resume, and you were able to see me before I got arrested,

24    you would never be able to say that someone with this physical

25    build would be a drug dealer.  All my life, I spent all my life

G9desobs

1   with the carbine and the pistol, and when I worked for the

2   government, the antiterrorist unit, later as a contractor.

3           That's all.  Thank you.

4           THE COURT:  We will take a break of five minutes while

5   I will continue to reflect on what I heard, and then I will

6   come out and explain and announce the sentence.

7           (Recess)

8           THE COURT:  I reviewed carefully all of the

9   submissions in advance of today's proceedings, and I have

10   listened very carefully to everything that has been said here

11   in court today.

12           I adopt the factual recitation that is set forth in

13   the presentence report, with the changes that we discussed

14   earlier on the record.  The Court has discretion, taking into

15   account the applicable statutory provisions in exercising its

16   power under Section 3553(a) of Title 18 to determine the

17   particular sentence to be imposed in each particular case.

18   That law requires the Court to consider a number of specific

19   factors and sentencing goals, which include the nature and

20   circumstances of the offense; and the defendant's history and

21   characteristics; the need for the sentence imposed to reflect

22   the seriousness of the offense, promote respect for the law and

23   provide just punishment, deterrence and protection of the

24   public, among other considerations.

25           The Court considers the types of sentences that are

G9desobs

 1   available and the provisions of the sentencing guidelines, as

 2   well as the need to avoid unwarranted sentencing disparities

 3   among defendants with similar records who have been found

 4   guilty of similar conduct.

 5          The law requires this Court to impose a sentence that

 6   is sufficient but not greater than necessary to comply with the

 7   statutory sentencing purposes.

 8          As to the sentencing guidelines, I conclude that the

 9   applicable guideline offense level is 33, for the reasons that

10   I explained earlier, and that the applicable criminal history

11   category is I.  Accordingly, the advisory guideline range for a

12   custodial sentence is from 135 to 168 months of imprisonment.

13   And I have used the November 2015 edition of the guidelines

14   manual in making these determinations.

15          I have considered the question of whether there is an

16   appropriate basis for a departure from the advisory range

17   within the guideline system, and I find no grounds warranting a

18   departure under the guidelines.  I have, therefore, gone on to

19   consider the full range of Section 3553(a) factors and all of

20   the information that has been put before me in light of the

21   Section 3553(a) factors and goals in determining the

22   appropriate sentence.

23          As to the nature and circumstances of the offense,

24   Mr. Soborski's offense is a very serious one.  Although in his

25   mind and by his specific conduct he limited his direct personal

G9desobs

```
 1   activities to surveillance and countersurveillance activities
 2   that were not themselves necessarily that significant, he did
 3   this in aid of the protection and support of an organization
 4   that he understood was engaged in the illegal transport of
 5   hundreds of kilos of illegal drugs to the United States and
 6   that was involved in violence in the protection of its
 7   activities.  He understood that the scope of work of the
 8   security team included violence and the opportunities for
 9   so-called bonus work.  He believed and had every reason to
10   believe at the time that the drug quantity that he was told was
11   involved in the shipment destined for the United States was
12   true.
13          And so his situation, although this was a sting
14   operation, it was one that is characteristic of the purpose and
15   efficaciousness of the sting operation.  It is the means of
16   identifying and incapacitating people who, like Mr. Soborski,
17   have skills and willingness to facilitate major dangerous drug
18   operations and potentially perpetrate violence.  It is not a
19   factor mitigating the seriousness of the crime to say that he
20   was able to do what he did with relative little effort and
21   obtain a lot of money for it.  People are drawn into this
22   activity and support and protect these sorts of organizations
23   for lots of money.  And sometimes they're able to do that
24   without engaging in violence themselves, but the purpose of the
25   activity and the effect of the activity is to put other lives
```

G9desobs

 1  in danger; to perpetuate dangerous drug trafficking, corruption

 2  and threats to both people who are working lawfully in law

 3  enforcement and societies in general.  And so Mr. Soborski's

 4  crime is a very serious one indeed.

 5          The Court recognizes that his life before this

 6  criminal activity was one that was quite admirable.  He had a

 7  distinguished career in the military.  He was entrusted with

 8  important antiterrorism and protection detail work and worked

 9  in a counterterrorism capacity for many years.  His country

10  helped him obtain these skills, and he served his country

11  faithfully.  But he then turned those skills in aid of activity

12  that was dangerous and illegal.

13          The Court recognizes that he is now in his 40s and

14  that a lengthy custodial sentence will put him in his later 40s

15  at a minimum by the time he is released.  And the Court

16  recognizes in this regard that statistically the risk of return

17  to criminal activity decreases with age.  And the Court also

18  recognizes that the injuries that Mr. Soborski has sustained

19  also make it less likely that he would have the same sorts of

20  opportunities that he had before.  And so this is a factor that

21  the Court considers in fashioning a sentence.

22          The Court also recognizes that the conditions of

23  Mr. Soborski's arrest and confinement, particularly the attack

24  and conditions of confinement when he was in Estonia, were far

25  harsher and injurious to Mr. Soborski than would be expected in

42

G9desobs

 1    the United States, and that his arrest and history in custody

 2    have been much harder on him than the experience of a normal

 3    federal prisoner.  And I will take those circumstances into

 4    account in fashioning his sentence.

 5            A lengthy custodial sentence is required, however,

 6    particularly to deter others from succumbing to the temptation

 7    to earn easy money by protecting dangerous organizations with

 8    skills legitimately obtained through public service.

 9            The Court also finds that a moderate variance will not

10    work in an unwarranted disparity between Mr. Soborski's

11    sentence and those of other similarly situated defendants.

12            And so having considered the seriousness of the

13    offense, the need for deterrence and protection of the public,

14    the severe injuries and medical complications that Mr. Soborski

15    has suffered while in custody and continues to work to

16    remediate and recover from the conditions of his confinement in

17    Estonia, and his age, which is indicative of a reduced risk of

18    recidivism, the Court finds that a downward variance from the

19    guideline sentencing range is necessary to ensure that the

20    sentence imposed is one that is reasonable within the meaning

21    of the law, appropriate and no greater than necessary to

22    satisfy the statutory purposes of sentencing.

23            The Court finds that Mr. Soborski is required to

24    forfeit to the United States the proceeds of his criminal

25    activity.  And the amount of those proceeds will be quantified

G9desobs

1    in a subsequent court order.  I will now state the sentence

2    that I intend to impose.

3            Mr. Soborski, would you and Mr. Stampur please stand.

4            Mr. Soborski, it is the judgment of this Court that

5    you are to serve 108 -- that is 1-0-8 -- months of

6    imprisonment, to be followed by two years of supervised

7    release.  The standard conditions of supervision 1 through 13

8    as detailed in the sentencing guidelines manual will apply.

9    These conditions will be announced specifically in the judgment

10   that I file and will be explained to you by the probation

11   department at the appropriate time.

12           You will also be subject to the following mandatory

13   conditions:  You must not commit another federal, state or

14   local crime.  You must not illegally possess a controlled

15   substance.  You must not possess a firearm or destructive

16   device.  You must refrain from any unlawful use of a controlled

17   substance.  And you must submit to one drug testing within 15

18   days of placement on supervised release and at least two

19   unscheduled drug tests thereafter, as directed by the probation

20   officer.  And you must cooperate in the collection of DNA, as

21   directed by the authorities.

22           You must also meet the following special conditions:

23   You must submit your person, your residence, your place of

24   business, your vehicle and any property, computers, electronic

25   communications, data storage devices and/or other media under

G9desobs

1   your control to a search on the basis that the probation

2   officer has reasonable suspicion that contraband or evidence of

3   a violation of the conditions of release may be found.  Any

4   search must be conducted at a reasonable time and in a

5   reasonable manner.  Failure to submit to a search may be

6   grounds for revocation of supervised release.  You must inform

7   any other residents that the premises may be subject to search

8   pursuant to this condition.  You must obey the immigration laws

9   and comply with the directives of the immigration authorities.

10  And if you are released into the United States, you will be

11  supervised by your district of residence.

12          In light of your financial circumstances, I will not

13  impose a fine on you.  I will order that you pay to the United

14  States the mandatory special assessment of $100, which is

15  payable in quarterly installments of $25 through the Bureau of

16  Prisons inmate financial responsibility program.  And I order

17  that you forfeit to the United States the proceeds of your

18  criminal activity to be quantified in a subsequent order.

19          I will recommend that the Bureau of Prisons credit the

20  time that you spent in custody in Estonia from September 13th

21  to April 2014 under -- sorry, September 2013 to April 2014

22  against this sentence.

23          I believe that this sentence is reasonable within the

24  meaning of the law, sufficient, appropriate and no greater than

25  necessary to satisfy the statutory purposes of sentencing,

G9desobs

1    which include punishment and deterrence.

2             Does either counsel know of any legal reason why this

3    sentence should not be imposed as stated?

4             MR. LOCKARD:  No, your Honor.

5             MR. STAMPUR:  No.  May I make a comment?

6             THE COURT:  First, I will say that the sentence as

7    stated is imposed.

8             Mr. Stampur?

9             MR. STAMPUR:  His codefendant, Michael Filter,

10   received a sentence of 72 months, which is exactly analogous.

11   And actually, Filter was more involved than my client.  I just

12   don't know if the Court remembers that.  When the Court just

13   referenced that it shouldn't be a disparity between

14   codefendants or people in like scenarios, Filter received 72

15   months, and now the Court is actually giving my client more

16   time than that when there is a distinctive difference between

17   the two of them.

18            THE COURT:  It is not my recollection that Filter

19   received 72 months.

20            MR. STAMPUR:  Or was it 84?

21            THE COURT:  I think it was 96.

22            MR. STAMPUR:  Then I stand corrected.  It was

23   definitely less than 108.

24            THE COURT:  It was less than 108, and there are

25   circumstances that, in the Court's judgment, warrant that

G9desobs

1    differential.

2              MR. STAMPUR:  Could the Court expand on that?

3              THE COURT:  Pardon?

4              MR. STAMPUR:  Might the Court expand on that, since --

5              THE COURT:  No.

6         Mr. Soborski, I have something important to tell you

7    about your appeal rights.  You have the right to appeal this

8    sentence.  If you are unable to pay the cost of an appeal, you

9    may apply for leave to appeal informa pauperis.  At your

10   request, the Clerk of Court will file a notice of appeal for

11   you.  Any notice of appeal must be filed within 14 days of the

12   judgment of conviction.  So be certain to talk to Mr. Stampur

13   about this today.

14        Mr. Stampur, are there any particular recommendations

15   that you would request that I make to the Bureau of Prisons?

16             MR. STAMPUR:  I just request that the Court designate

17   Mr. Soborski to the northeast corridor.  He asked me

18   specifically for Fort Dix as a possibility.

19             THE COURT:  So I will recommend Fort Dix or other

20   suitable facility in the northeast to facilitate communications

21   with counsel.  And should I say in connection with appeal or

22   no?

23             MR. STAMPUR:  I'm sorry?

24             THE COURT:  Should I say to facilitate communications

25   with counsel --

G9desobs

1             MR. STAMPUR:  On appeal, yes.

2             THE COURT:  And appeal?

3             MR. STAMPUR:  Yes.

4             THE COURT:  I will make that recommendation.

5             Mr. Lockard, are there any remaining counts or

6    underlying indictments that need to be dismissed at this time?

7             MR. LOCKARD:  Yes, your Honor.  At this time the

8    government moves to dismiss all open counts.

9             THE COURT:  That application is granted.

10            Mr. Soborski, I just have a few more words, and I

11   thank you for listening.

12            The sentence that you've received today is a long one.

13   And I have done my best to explain why that is the case.  I do

14   understand that you recognize and wish you hadn't taken the

15   steps that have brought you down this road.  You're paying a

16   very heavy price for them.  But every choice that you make

17   going forward is your own.  And it is up to you to make choices

18   that are healthy and lawful and ones that will help you

19   continue to build the most solid foundation that you can build

20   for the remainder of your life.  And I urge you to think in

21   those terms and do that every day, even as you're continuing to

22   serve the rest of this sentence.

23            You have a son who I'm sure you want to encourage to

24   be on and stay on the right path for his life.  And so think of

25   your ability to be a good example for him and encourage him.

G9desobs

1    And think of the people whose lives you've touched in a

2    positive way and who love and admire you.  You think of the

3    letter from your sister and the letter from your former partner

4    in this regard.

5          And so I encourage you to make choices that reflect

6    the honor that you deserve as a person, that you should show

7    yourself and that society should show you, and that you wish to

8    show your family and your son.  And that you learn from this

9    very hard experience that easy money can have very, very

10   serious consequences and end up having a very high price tag.

11   And so I urge you to decide and promise yourself and promise

12   your family, if you haven't already done so, that you'll never

13   again do anything that could even put you at risk of going to

14   prison.

15         I wish you a continued effective and full recovery

16   from your injuries.  And I wish you and your family continued

17   strength and courage.  And I do thank you for listening.

18         I thank Mr. Stampur for his work and Mr. Lockard for

19   his.  I will direct that counsel be provided with an amended

20   copy of the presentence report and that a complete corrected

21   copy be prepared for the Bureau of Prisons and the sentencing

22   commission.  All other copies must remain confidential.  If an

23   appeal is taken, counsel on appeal are to be permitted access

24   to the report.

25         Counsel, is there anything further that we should take

G9desobs

1    up together this afternoon?

2              MR. LOCKARD:  Not from the government.

3              MR. STAMPUR:  No, your Honor.

4              THE COURT:  And is that a no, Mr. Stampur?

5              MR. STAMPUR:  No.

6              THE COURT:  All right.  Thank you all.  Keep well.

7              We are adjourned.

8              (Adjourned)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25