UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
UNITED STATES OF AMERICA          :

      -against-                               :         S7 13-CR-521-05 (LTS)

SLAWOMIR SOBORSKI,                  :

           Defendant.             :
-------------------------------------------------------x

# MEMORANDUM IN AID OF RESENTENCING
# ON BEHALF OF DEFENDANT SLAWOMIR SOBORSKI

William J. Stampur, ESQ.
Stampur and Roth
Attorney for the Defendant
SLAWOMIR SOBORSKI
299 Broadway, Suite 800
New York, NY 10007
212-619-4240

## PRELIMINARY STATEMENT

This memorandum is submitted on behalf of Slawomir Soborski who is scheduled for resentencing on May 10, 2018, consistent with the Order of the United States Court of Appeals for the Second Circuit issued on October 2, 2017.

For the reasons set forth below, it is respectfully submitted that Mr. Soborski was a minor participant in the offense and should be granted a 2-level reduction in offense level under § 3B1.2 of the United States Sentencing Guidelines. Pursuant to U.S.S.G. § 2D1.1(a)(5), a further 3-level reduction would then apply, resulting in a Total Offense Level of 28 and advisory Guidelines range of 78 to 97 months' imprisonment[1].

## BACKGROUND

### A. Status of Co-Defendants

In September 2013, a federal grand jury sitting in the Southern District of New York returned a five-count indictment in which Soborski was charged with: conspiring to import cocaine into the United States, in violation of 21 U.S.C. §§ 963 and 959 (Count One, also charging Hunter, Vamvakias, Gogel, and Filter); and conspiring to distribute cocaine on board an aircraft registered in the United States, in violation of 21 U.S.C. §§ 963 and 959(c) (Count Five, also charging Vamvakias, Gogel, and Filter). Hunter, Vamvakias, and Gogel, were also charged in additional counts with crimes relating to their participation in a plot to murder a DEA agent and a DEA source.

As the Court may recall, in July 2015 Vamvakias was sentenced to 240 months' imprisonment (including 240 months on Count One), in September 2015 Filter was sentenced to

---

[1] Mr. Soborski has zero criminal history points and is in Criminal History Category I. PSR ¶ 72.

1

96 months' imprisonment on Count One, in October 2015 Gogel was sentenced to 240 months' imprisonment (including 240 months on Count One), and in June 2016 Hunter was sentenced to 240 months' imprisonment (including 240 months on Count One).

**B.     Developments Subsequent To The Initial Sentencing**

Shortly after Mr. Soborski's sentence on September 13, 2016 he was transferred from the MDC in Brooklyn to Fort Dix Correctional Facility where he has remained to this day. He has never received any disciplinary infraction while incarcerated either in the MCC, MDC or Fort Dix. He is currently 46 years old, has still not recovered from the serious injuries he sustained in Estonia in the aftermath of his arrest and extradition to the United States, and remains truly remorseful for his actions. As a Polish citizen Mr. Soborski can not participate in any Bureau of Prisons programs which allow other inmates get their sentence reduced (sometimes by as much as 12 months), and he is also not eligible for early release to a halfway house. Because Immigration and Customs Enforcement (ICE) has filed an ICE detainer, at the completion of his prison sentence Mr. Soborski will remain in ICE custody for an additional unknown period of time with no guarantee of immediate departure from this country.

In October 2017 Mr. Soborski learned that his father Zdzislaw Soborski passed away. Slawomir has never received a visit from any family member since his incarceration, as the financial burden to travel here has been, and remains, prohibitively expensive.

## DISCUSSION

**A.     Mr. Soborski Should Be Granted a Minor Role Reduction under U.S.S.G. § 3B1.2**

Under Section 3B1.2 of the Guidelines, a defendant's offense level is reduced by two levels if he was a "minor participant in any criminal activity," four levels if a "minimal

participant," and three levels if falling somewhere between those two categories. U.S.S.G. § 3B1.2. In determining whether such a reduction is appropriate, "the defendant is to be compared with the other participants" in the crime, not with a hypothetical average participant. U.S.S.G. App. C. Amend. 794. When conducting that analysis, a sentencing court "should consider the following non-exhaustive list of factors":

> (i)    the degree to which the defendant understood the scope and structure of the criminal activity;
>
> (ii)   the degree to which the defendant participated in planning or organizing the criminal activity;
>
> (iii)  the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;
>
> (iv)   the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;
>
> (v)    the degree to which the defendant stood to benefit from the criminal activity.

U.S.S.G. §3B1.2, comment. (n. 3(C)).

The Commission's clear directive is for courts to determine a defendant's relative culpability by reference to co-participants in the case at hand, and examining the relative culpability of others involved in the specific criminal enterprise.

As then district court judge Lynch explained, when considering a mitigating role adjustment, "a court should not lose sight of the effect of the adjustment on the fairness of the resulting sentence." *United States v. Ruiz*, 246 F. Supp. 2d 263, 269 (S.D.N.Y. 2002).

> This is not to say that a court may arbitrarily apply the adjustment in a result-oriented manner, to impose whatever sentence the judge feels is appropriate for a particular offender. It is to say, however, that the Sentencing Guidelines strive to create a rational scheme, and that the various offense levels and adjustments are intended to result in a punishment geared to each defendant's culpability. The

3

> Commission's decision to increase the punishment in drug cases based on the quantity of drugs imported or distributed makes perfect sense in light of that goal, because large-scale drug dealers are more culpable than small-scale operatives. But by the same token, [the] distance between the supporting players and the principal offenders can be much greater in a large conspiracy than in a small one. **The difference in power and culpability between the one-kilo dealer and his driver is proportionately less than that between the international drug kingpin and his.**

*Id.* (Emphasis added).

### 1. Knowledge of the Scope of the Criminal Activity Does Not Bar a Mitigating Role Reduction

At the initial sentencing, the Court found that no role reduction was appropriate because the evidence indicated that Mr. Soborski was "fully aware of the scope, structure and overall nature of the criminal enterprise, including its use of violence and of the volume of purported drug trafficking he had been hired to protect." 9/13/16 Tr. at 17-18.

The commentary to § 3B1.2 states that a "minimal participant" is a defendant who is "plainly among the least culpable of those involved in the conduct of a group," and explains that "the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant." §3B1.2, comment. (n.4). In contrast, a "minor participant" is one "who is less culpable than most other participants, but whose role could not be described as minimal." U.S.S.G. § 3B1.2, comment. (n.5).

Thus, while such knowledge is relevant to determining whether a defendant was a minor or minimal participant, it does not, on its own, preclude a mitigating role reduction. *See United States v. Perez*, 321 F. Supp. 2d 574, 585 (S.D.N.Y. 2003) (granting minor role adjustment even where defendant had "considerable knowledge of the scope and structure of the enterprise")

**2. Mr. Soborski Was Not Involved in Planning the Offense, Had No Decision-making Authority, and Had No Discretion to Deviate from the Directions He Was Given**

Mr. Soborski did not participate in any planning or organizing of the criminal activity, had no decision-making authority, and played only a menial role in the overall scheme. He accepted the invitation of Joseph Hunter to join his team of former military personnel, with whom he had no prior connections, as they would provide security or purported "counter-surveillance" to what Mr. Soborksi ultimately came to believe (only after having already traveled to Thailand) was a drug-trafficking organization.

Mr. Soborski's involvement in the conspiracy was on the periphery of both Hunter's organization and the fictitious drug trafficking organization they were working for. Mr. Soborski's role was essentially that of a lookout - conducting counter-surveillance as cocaine was purportedly loaded onto a plane and marine vessel for importation into the United States. Other than that, he did not assist in loading or actually transporting any cocaine. He was not involved in any distribution, nor any transactions or negotiations, was not formally or informally a part of any drug trafficking organization, was not a stakeholder in the actual distribution and at most agreed to help facilitate importation. He kept mostly to himself and did not socialize extraneously with his co-conspirators, nor was his motive anything other than the lure of financial gains for relatively simple work. Quite literally, he stood apart from the other members of the conspiracy.

There is no dispute that Hunter was "responsible for recruiting" the other conspirators, "supervised all of them, and he reported on their activities to the CSes who purportedly hired them." PSR ¶53. It was Gogel who recruited Filter into the scheme and who acted as the leader

5

of the security team during the April 2013 negotiations in Mauritius[2]. And Vamvakis was the "mission leader" for the surveillance job in the Bahamas, staying "in regular telephone contact with one of the CSes to provide status reports based on the team's efforts." PSR ¶43, A. 130. Mr. Soborski, in contrast, had no such recruitment or supervisory responsibilities and merely worked as a hired hand taking directions from the others. Thus, based on those facts Mr. Soborski is less culpable than the average participant in this narcotics conspiracy and could have easily been replaced without impacting the operation of the conspiracy. *See United States v. Vicente Fernandez*, 312 F. Supp. 2d 522, 525 (S.D.N.Y. 2004) (granting role adjustment where defendant's "role was essentially fungible"); *United States v. Sanchez*, 925 F.Supp. 1004, 1013 (S.D.N.Y.1996) (characterizing defendant as "replaceable").

It would be difficult for the government to argue that a minor role adjustment is not warranted where the Guidelines call for one where the defendant's role was exponentially more involved with the distribution itself (transporting or storing, per U.S.S.G. § 3B1.2 cmt. app n. 3). Likewise, couriers and mules will often be eligible for a mitigating role adjustment. *See, e.g., United States v. Rodriguez*, 342 F.3d 296 (3d Cir. 2003) (reversing denial of minor role adjustment and noting that couriers and mules are often "small players" in the importation scheme eligible for the reduction despite their "integral" function in transporting the contraband[3]). If a defendant who *transports* drugs is eligible for a mitigating role adjustment,

---

[2] See government's sentencing memorandum in United States v. Gogel, 13 Cr. 521 (LTS), Doc. No. 198 at p. 18.

[3] It might be gainsaid that without the sort of services Mr. Soborski conspired to provide, drug trafficking organizations might not be able to transport product as effectively, or function as efficiently. Even if that is the case, however, enabling and facilitating narcotics distribution or importation justifies the decision to charge him, and his decision to plead guilty and accept responsibility, *not* the imposition of a draconian sentence intended for drug traffickers themselves and those more directly in the chain of distribution, importation and manufacturing.

then a defendant whose conduct is at least one step removed from actual transport – only helping to ensure the security of the transport or shipment – is at least as entitled to a minor role adjustment. It would be likewise anomalous if those who were personally involved with real narcotics distribution are eligible for a mitigating role adjustment, but those who only tangentially connected to drugs that were fictional, were not.

Finally, at the initial sentencing while the Court did note that "at least at times Mr. Soborski indicated his willingness to participate in such activities," (referring to the violent "bonus work"), Soborski did not actually engage in the so-called "bonus-work" or the assassination plot that ensnared his co-defendants. Whatever errors in judgment Mr. Soborski showed in entering into the conspiracy, he had sense enough to make clear that he wanted nothing to do with Hunter's other involvement in conspiring to assassinate a DEA informant, a purported leak in the Colombian organization, and a DEA Agent. Not only it was well beyond the scope of what Mr. Soborski agreed to undertake, but the Guidelines clearly state that it is "the nature and extent of the defendant's participation in the commission of the criminal activity" and not merely any *desire* of the defendant to participate which is relevant. U.S.S.G. §3B1.2, comment. (n. 3(C)(iv)).

In sum, the sins of Mr. Soborski's co-defendants should not be visited upon him. In particular, Mr. Soborski had nothing to do with the so-called "bonus-work" and the assassination plot that ensnared his co-defendants here. It was well beyond the scope of what Mr. Soborski agreed to undertake.

### 3. Soborski's Financial Benefit Was *De Minimis*

"[A] defendant who does not have a proprietary interest in the criminal activity and who is simply being paid to perform certain tasks should be considered" for a mitigating role adjustment. U.S.S.G. §3B1.2, comment. (n. 3(C)).

> When a prosecution focuses on an individual small narcotics transaction, or a small series of such transactions, the punishment is relatively modest, and the relationships among the players may well be more obscure based on the limited evidence available from typical "buy and bust" investigations. In such a setting, it makes eminent sense to punish "steerers" and lookouts, the person who takes the payment and the person who delivers the drugs, equally; none can easily be identified as playing a substantially lesser role than the others, or than the "average" participant in such an operation. . . . Once it is known that a larger enterprise existed, it no longer makes sense to see salaried employees functioning in limited roles as "average" participants in a multi-kilogram narcotics operation, to be treated equally with someone who sold such quantities of drugs for his own profit.

*United States v. Perez*, 321 F. Supp. 2d at 586.

Here, there is no allegation that Mr. Soborski had any financial interest in the conspiracy beyond what he was paid to perform his specific tasks. While the government has yet to specify any amount it believes he would need to forfeit, Hunter was ordered to forfeit up to $450,000 and Gogel was ordered to forfeit not more than $100,000 – and they were both involved in the narcotics conspiracy as well as the murder and weapons possession conspiracies (Counts Two, Three, Four, and Five). Further, as to the murder for hire conspiracy, Hunter, Vamvakias, and Gogel were to be paid approximately $700,000, and Hunter was to receive an additional payment of $100,000 for his leadership role. *See* PSR ¶ 26.

Filter was ordered to forfeit no more than $100,000, although the government estimated that the actual amount would be closer to $70,000[4]. As Mr. Soborski's conduct is most closely related to Filter's, assuming (but certainly not conceding) Mr. Soborski earned $70,000 or less from the offense, that amount is absolutely minute when viewed in the context of a conspiracy involving hundreds of kilograms of cocaine.

### B.   The Applicable Advisory Guidelines Range Should Be 78 to 97 Months' Imprisonment

In this case, because Mr. Soborski's base offense level is 36, if the minor role reduction is granted the base offense level will reduced by three levels through operation of U.S.S.G. §2D1.1(a)(5)[5]. *See* U.S.S.G. §3B1.2, comment. (n. 6) (where the defendant's base offense level under §2D1.1 "was reduced by operation of the maximum base offense level in §2D1.1(a)(5), the court also shall apply the appropriate adjustment under this guideline."). Assuming no other changes in the Guidelines calculation initially relied on, the resulting total offense level will be 28 and the advisory Guidelines range will 78 to 97 months' imprisonment.

---

[4] See transcripts of sentencing proceedings in *United States v. Hunter* (Doc. 336) at p. 10, *United States v. Gogel* (Doc. 308) at p. 37, *United States v. Filter* (Doc. 208) at p. 21-22.

[5] "[I[f (A) the defendant receives an adjustment under §3B1.2 (Mitigating Role); and (B) the base offense level under subsection (c) is. . . level 34 or level 36, decrease by 3 levels . . . ." U.S.S.G. § 2D1.1(a)(5).

9

## **CONCLUSION**

For those reasons, we respectfully ask the Court to assess a mitigating role adjustment and resentence Mr. Soborski based on an advisory Guidelines range of 78 to 97 months' imprisonment.

We continue to recognize the seriousness of the offense at issue and the need for the Court's sentence to further the goals of punishment and deterrence – as required by the Sentencing Reform Act of 1984, Pub. L. No. 98-473 Section 211, 98 Stat. 71987, 1989-90 (1984) (the "Sentencing Reform Act" or "the Act"). This submission respectfully requests the Court also pay fealty to other sentencing goals within the construct of the Act in arriving at a sentence that is "sufficient but not greater than necessary" to fulfill the statutory mandate.

I thank the Court for its consideration of the issues presented herein.

Dated: February 23, 2018

New York, NY

Respectfully Submitted,

William J. Stampur
299 Broadway Ste. 800
New York, NY 10007