UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
UNITED STATES OF AMERICA
:
       - v. -                                  S7 13 Cr. 521 (LTS)
:
SLAWOMIR SOBORSKI,
:
              Defendant.
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM

                                                 GEOFFREY S. BERMAN
                                                 United States Attorney for the
                                                 Southern District of New York

Michael D. Lockard
Emil J. Bove III
    Assistant United States Attorneys,
      Of counsel

The Government respectfully submits this memorandum in connection with the resentencing of the defendant, Slawomir Soborski, scheduled for March 23, 2018, at 2:00 p.m.  For the reasons discussed below, the Government respectfully submits that the correctly calculated sentencing range under the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") is 135 to 168 months and that a sentence within this range would be sufficient, but not greater than necessary, to comply with the purposes set forth in Title 18, United States Code, Section 3553(a)(2).  *See* 18 U.S.C. § 3553(a).

## BACKGROUD[1]

On September 13, 2016, following a sentencing hearing, the Court announced the sentence for Soborski consisting principally of a term of imprisonment of 108 months and a term of supervised release of two years.  The judgment of conviction was entered on September 22, 2016 (D.E. 352) and Soborski timely filed a notice of appeal on October 3, 2016.  On September 11, 2017, the Court of Appeals entered a summary order vacating the sentence and remanding for resentencing.  (D.E. 428) (the "Summary Order").  The sole issue on remand is whether Soborski was a minor participant under U.S.S.G. § 3B1.2.  (Summary Order at 12).[2]  Soborski "[did] not challenge the factual findings in the PSR, which were adopted in relevant part by the District Court."  (*Id.* at 3-4).

---

[1] The factual background is described in detail in the superseding indictment, S7 13 Cr. 521 (LTS) (D.E. 11) ("Indictment" or "Ind."), the Government's original sentencing memorandum dated November 5, 2015 (D.E. 223) ("Gov't Mem."), and the revised Presentence Investigation Report dated September 27, 2016 ("PSR") prepared by the United States Probation Office ("USPO" or "Probation"), each of which is incorporated by reference.  Because the Court is intimately familiar with those facts, they will be addressed as relevant to Soborksi's sentencing arguments rather than reiterated in their entirety.

[2] The Summary Order vacated Soborski's sentence because the panel was "unsure about whether the District Court knew that" the November 2015 Guidelines "rejected the 'universe of persons' standard applied by our precedents under the older version of the §3B1.2 commentary." (Summary Order at 9).  The Government is nonetheless confident that the Court correctly understood and applied the Guidelines at Soborski's sentencing.

Section 3B1.2 of the Guidelines provides, "[i]f the defendant was a minor participant in any criminal activity," the offense level is decreased by 2 levels. U.S.S.G. § 3B1.2(b).³  The application notes elaborate that the provision applies to "a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant in the criminal activity." U.S.S.G. § 3B1 cmt. n.3(A).  In comparing the defendant's culpability to the average participant, "the defendant's relative culpability is determined only by reference to his or her co-participants in the case at hand." (Summary Order at 7) (quoting U.S.S.G. app. C, amend. 794).  The application notes go on to explain that: "[i]f a defendant has received a lower offense level by virtue of being convicted of an offense significantly less serious than warranted by his actual criminal conduct, a reduction for a mitigating role under this section ordinarily is not warranted . . . ." U.S.S.G. § 3B1 cmt. n.3(B).  The determination of the defendant's role is "based on the totality of the circumstances and involves a determination that is heavily dependent upon the facts of the particular case." U.S.S.G. § 3B1 cmt. n.3(C).

In his prior sentencing submission, Soborksi argued that he should receive a minor-role adjustment because Soborksi "was a hired hand, provided a limited function, was not integral to the success of the venture, and remained largely ignorant of the scope and activities of the larger organization." (D.E. 214 at 23-24).  The Court rejected Soborski's argument for a minor-role adjustment, holding that "the facts of this case do not support the application of Section 3B1.2(b) of the guidelines to include a minor role adjustment." (Tr. at 17).  Responding to Soborski's argument that he was "largely ignorant of the scope and activities of the larger organization," the Court specifically noted evidence "including transcripts of recorded conversations, demonstrating

---

³ Pursuant to U.S.S.G. § 2D1.1(a)(5)(ii), when the defendant's base offense level based on the Drug Quantity Table would otherwise be level 34 or 36 and the defendant receives an adjustment under § 3B1.2, the base offense level is also reduced by 3 levels.

3

Mr. Soborksi's awareness of the full scope of the criminal enterprise in this case," and that "Mr. Soborski indicated his willingness to participate in such activities, although he was not ultimately selected to participate in the particular murder-for-hire plot that is a central aspect of the prosecution of some of his co-defendants." (Tr. at 17-18).

## ARGUMENT

In his post-remand sentencing submission (D.E. 498) ("Soborski Mem."), Soborski argues that he should receive a minor-role adjustment principally because he (a) "did not participate in any planning or organizing of the criminal activity, had no decision-making authority, and played only a menial role in the overall scheme" (Soborski Mem. at 5-6) and (b) did not have "any financial interest in the conspiracy beyond what he was paid to perform his specific tasks." (*Id.* at 8-9). Soborski argues that his role was less than the roles of his co-defendants and that he was paid less. (*Id.* at 7, 8-9).

Soborski's arguments should be rejected. His factual contentions concerning his conduct are incorrect, and his comparisons to his co-defendants are sometimes factually inaccurate and sometimes legally inapt. Indeed, Soborski repeatedly invites the Court to measure his conduct against conduct that was not part of the offenses for which he was convicted, including (a) the total scope of the purported drug trafficking organization, in which *none* of the defendants participated because the cartel was an investigative ruse; and (b) the conspiracy to commit murder-for-hire, which Soborski was aware of and exhibited an desire to join in, but which is not an offense to which he pleaded guilty.

For example, Soborski argues that he was recruited to a security and counter-surveillance job and only realized after traveling to Thailand that the client was a purported drug-trafficking organization. (Soborski Mem. at 5). The record is clear, however, that while Soborski may only

4

have learned the specifics upon his arrival in Thailand in February 2013, he intentionally volunteered for work that he expected to be illicit.  The evidence shows that when Joseph Hunter, the head of security for a Philippines-based transnational criminal organization, solicited members of the security team through a trusted network of friends, he did not hide the nefarious character of the work, referred to as "bonus jobs," "specialist jobs," or "ninja" work.  As Soborski's co-defendant, Dennis Gogel confirmed in a January 20, 2013 email to Hunter (before the group travelled to Thailand): "I full[y] understand what 'Ninja' means . . . ."

Soborski's email volunteering his resume to Hunter indicates that he already had received information from a friend showing that the work would not be legitimate.  Soborski's February 5, 2013 email read:  "I received your email from . . . my old friend from French Legion.  I got from him information about a job for you.  I would like to send you my resume for current and future job openings.  I am convinced that my experience, commitment and professionalism, confirmed by my references, will lead to the success of your company and mutual satisfaction."  Soborski's resume touted his counter-terrorism experience with the Polish military, his weapons training (including sniper), and his suitability for "High Risk Close Protection" and "Personal Security."  After receiving the resume, Hunter described Soborski to a cooperating witness ("CW-1") as one of "two highly qualified individuals that will get a lot of stuff done for us."  In another email that day, Soborski assured Hunter, "I'm ready [to] go to duty ASAP."  Hunter, accordingly, directed Soborski to travel to Thailand, dressed "like a tourist" with "nothing military or police looking."

When Soborski and co-defendants Gogel and Michael Filter arrived in Phuket in early March 2013, Hunter explicitly described the work they would be undertaking if they agreed to do so:  security for the operations of a multi-ton drug trafficking organization, and murders-for-hire.  Soborksi displayed neither surprise nor hesitation.  To the contrary, he showed satisfaction and

readiness, saying: "Good," and then responding approvingly and laughing during Hunter's description of past shootings, kidnappings, and murders. (*See* PSR ¶ 28; Gov't Mem. at 5-7). Soborksi had plenty of opportunity to back out of the job before meeting with the purported representatives of the cartel, but instead knowingly and enthusiastically agreed to join the organization. (*Id.* at 7-11).

Similarly, Soborski contends he never exercised supervisory or decision-making authority in the commission of the offenses, while Hunter was responsible for managing the team and Gogel and Vamvakias were team leaders for specific assignments. (Soborski Mem. at 5-6). But Soborski took a lead role in the security team's very first assignment, the surveillance of a boat in Thailand they believed would be involved in transporting large quantities of cocaine: Soborski provided the results of their surveillance to Hunter in a series of approximately 20 emails on March 22, 2013. (Govt' Mem. at 11). After that job, Gogel was formally designated "team leader" for the Mauritius assignment and Vamvakias was so designated for the murder-for-hire assignment, but no single member of the mercenary team consistently exercised supervisory authority over the others.

Soborski next argues that he "was not involved in any distribution, nor any transactions or negotiations, was not formally or informally a part of any drug trafficking organization, was not a stakeholder in the actual distribution and at most agreed to help facilitate importation." (Soborski Mem. at 5). As an initial matter, *none* of the defendants were involved in any actual distribution of narcotics or negotiations of actual drug transactions, because the purported cartel did not exist. But *each* of the defendants, including Soborksi, believed that he had been hired by a South American cartel to provide security for drug transportation vessels and drug flights purportedly involving huge quantities of cocaine—which Soborski and his co-defendants in fact provided in Thailand and the Bahamas; for large-quantity drug negotiations—which Soborski and his co-

6

defendants in fact provided at meetings in Mauritius between the CSes and actual drug and weapons traffickers, and which Soborski and Filter intended to do on their trip to Estonia, where they were arrested after conducting pre-meeting reconnaissance. (Gov't Mem. at 11-16). Soborski's invitation for the Court to analogize himself to "couriers and mules" (Soborski Mem. at 6-7) not only ignores the significantly more culpable nature of his conduct, but also ignores the Guidelines' instruction to compare his conduct to his co-participants rather than hypothetical average participants. Soborski's request that the Court compare his role to that of co-defendants who, unlike Soborski, were convicted for conspiring to commit murder-for-hire (*id.* at 7 & 8-9) fails for the same reason.

Soborski's complete lack of regard for the significance of the criminal activities in which he joined were best summarized by Soborksi himself at his sentencing hearing: he was a gun-for-hire and couldn't care less that the activities he was hired to protect were dangerous, destructive, and illegal. As he told the Court, he wasn't interested in "gaining any profit from narcotics"—though he was more than happy to collect a generous salary, housing, and expenses from narcotics traffickers—but for him the issue of providing essential security for narcotics trafficking was "not complicated." (Tr. at 34; *see also id.* at 35). Amazingly, however, Soborksi did refuse to work security in South America if it involved efforts to combat "guerillas"—deadly paramilitary and drug trafficking organizations like the FARC or the AUC—because he perceives them as "heroes." (*Id.* at 35).

In short, the Court correctly evaluated the facts and applied the law in determining that Soborksi was not a minor participant in the offenses for which he was convicted. The applicable sentencing range is thus 135 to 168 months' imprisonment. A sentence lower than the 108-month term of imprisonment to which the Court previously sentenced Soborski would not adequately

reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, or afford adequate deterrence to criminal conduct. 18 U.S.C. § 3553(a)(2).

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that the defendant's request for a minor role adjustment be denied.

Dated: New York, New York
March 9, 2018

                                                                            Respectfully submitted,

                                                                            GEOFFREY S. BERMAN
                                                                            United States Attorney for the
                                                                            Southern District of New York

                                                 By:       /s/
                                                                            Michael D. Lockard/Emil J. Bove III
                                                                            Assistant United States Attorneys
                                                                            (212) 637-2193/2444

Cc:     Counsel of record (by ECF)